109 U.S. 446 (1883)
CUNNINGHAM
v.
MACON & BRUNSWICK RAILROAD COMPANY and Others.
Supreme Court of United States.
Argued November 2d, 5th, 1883.
Decided December 3d, 1883.
APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF GEORGIA.
Mr. A.G. Magrath and Mr. W.W. Montgomery for appellant.
*447 Mr. Clifford Anderson and Mr. Joseph H. Choate for appellees.
MR. JUSTICE MILLER delivered the opinion of the court.
This is an appeal from the decree of the Circuit Court for the Southern District of Georgia, dismissing the bill of complainant on demurrer.
The bill is filed by Cunningham, a citizen of the State of Virginia, against Alfred H. Colquitt, as governor of the State of Georgia, J.W. Renfroe, as treasurer of the State, the Macon and Brunswick Railroad Company, and A. Flewellen, W.A. Lofton, and George S. Jones, styling themselves directors of said railroad company, John H. James, a citizen of Georgia, and the First National Bank of Macon.
The bill sets out, with reasonable fulness and with references to exhibits which make its statements clear, what we will try to state, as far as necessary, in shorter terms.
It alleges that on the 3d day of December, 1866, the assembly of Georgia passed an act authorizing the governor to indorse the bonds of the Macon and Brunswick Railroad Company to the extent of $10,000 per mile, and that under this authority the governor indorsed bonds to the amount of $1,950,000, which were afterwards negotiated by said company. The statute under which this was done made the indorsement of these bonds to operate as a prior mortgage upon all the property of the company, which could be enforced by a sale by the governor upon default in payment of the bonds so indorsed, or interest on them as it fell due. In addition to this the company executed and delivered to the governor, on the 22d of June, 1870, a written mortgage confirming the lien created by the statute, which was duly acknowledged and recorded.
October 27th, 1870, the legislature, by an act amending the act of December 3d, 1866, authorized the governor to indorse an additional $3,000 per mile of the bonds of the company, which was done, and of this series of bonds the complainant became the holder and owner of nineteen for $1,000 each.
It is then alleged that on July 1st, 1873, the company failed *448 to pay its interest coupons upon both these sets of indorsed bonds, and that in a few days thereafter the governor, under the power vested in him by the act of 1866, took possession of the road and the property of the company and placed them in the hands of Flewellen as receiver; and that on the first Tuesday in June, 1875, he sold said road to the State of Georgia for the sum of $1,000,000, and made a conveyance of it to the State accordingly, a copy of which is filed as an exhibit to the bill. It is also alleged that the State of Georgia has taken up since that time the entire issue of $1,950,000, giving her own bonds in place of the bonds which she had so indorsed.
The bill assails this transaction because the governor, in advertising the sale, gave notice that he would accept in payment for bids bonds of the State at par, or bonds of the first series of $1,950,000 at their market value, or cash, and would not receive any of the second series of $600,000 in payment. Also because the sale was made improvidently, at a bad time, as the governor was informed by his agent, Flewellen, and because the governor was not authorized to bid for the property, and the State had no constitutional power to make the purchase.
And it is further alleged that if the sale is not absolutely void, it is voidable, because under the statutory and executed mortgages the State is trustee of the property mortgaged for the benefit of the bondholders, and her purchase can be set aside by the beneficiaries under the trust when they elect to do so. The bill insists that by the taking up and payment of the first series of indorsed bonds their lien on the property is extinguished, and that of the second series is now become paramount, and this suit is brought to foreclose that mortgage lien.
And if the court shall be of opinion that the sale was valid, then the bill insists that the holders of the second series were entitled to be paid pro rata under that sale, and that when the legislature of Georgia appropriates any money to pay the bonds which it gave in exchange for $1,950,000 of the indorsed railroad bonds, the amount so appropriated should be divided pro rata between these bonds and the $600,000 of the second series of indorsed bonds.
The prayer of the bill is for the appointment of a receiver *449 to whom all the property of the company shall be delivered; that the mortgage be foreclosed and the proceeds applied to payment of the bonds of the second series so far as necessary for that purpose; or, if the court shall be of opinion that the sale was valid, that Renfroe be enjoined from paying the coupons of interest on the State bonds exchanged for the first series of bonds, and that the holders thereof be made parties to the suit, and be compelled to account to the holders of the $600,000 series of bonds for their pro rata share of said exchanged bonds; and the bill prays that Colquitt, the governor, and Renfroe, the treasurer, and the three directors of the company, be compelled by subpna to appear and answer it and certain interrogatories in it, and produce certain papers; and that Renfroe be enjoined from paying the coupons on the State bonds exchanged for the indorsed bonds; and that the State of Georgia may come in and make herself a party defendant to this bill if she should wish to do so; and there is a prayer for general relief.
To this bill there was filed by Flewellen, Lofton, and Jones, the directors, a demurrer and plea, as it is called. The plea is to the effect that they have no interest in the road otherwise than as agents of the State of Georgia, for which they hold and control the Macon and Brunswick Railroad and all its property and franchises of every description, and the plea and demurrer both rely on the proposition that the court has no jurisdiction of the case, because it cannot proceed without the State as a party, and that the court cannot compel the State to become a party to the suit.
Renfroe, the treasurer, filed a similar plea, and Colquitt, the governor, filed a demurrer and a plea separately.
The ground of demurrer stated by the governor is that it is apparent on the face of the bill that the court cannot take cognizance of the matters and things set up in said bill as against the defendant, because it appears that he has no personal interest in the same, but that it is an attempt to make the State of Georgia a party to the suit through the defendant as governor, so as to bind the State by the judgment and decision of the court in the case.
*450 On this demurrer of Colquitt and the joint demurrer of the three trustees the case was decided and the bill dismissed.
Mr. Justice Woods in dismissing it said:
"The bill is to all intents and purposes a suit against the State. It is mainly her property, and not that of Alfred H. Colquitt or J.W. Renfroe, that is to be affected by the decree of this court. It is the title of the State that is assailed. The attack is not made against the State directly, but through her officers. This indirect way of making the State a party is just as open to objection as if the State had been named as a defendant." 3 Wood's R. 426.
The failure of several of the States of the Union to pay the debts which they have contracted and to discharge other obligations of a contract character, when taken in connection with the acknowledged principle that no State can be sued in the ordinary courts as a defendant except by her own consent, has led, in recent times, to numerous efforts to compel the performance of their obligations by judicial proceedings to which the State is not a party.
These suits have generally been instituted in the circuit courts of the United States, or have been removed into them from the State courts.
The original jurisdiction of this court has also been invoked in the recent cases of The State of New Hampshire v. The State of Louisiana and The State of New York v. The State of Louisiana, 108 U.S. 76. These latter suits were based on the proposition that the constitutional provision that States might sue each other in this court would enable a State whose citizens were owners of obligations of anòther State to take a transfer of those obligations to herself and sue the defaulting State in the court. The doctrine was overruled in those cases at the last term by the unanimous opinion of the court.
In the suits which have been instituted in the circuit courts the effort has been, while acknowledging the incapacity of those courts to assume jurisdiction of a State as a party, to proceed in such a manner against the officers or agents of the State government, or against property of the State in their *451 hands, that relief can be had without making the State a party.
The same principle of exemption from liability to suit as applied to the government of the United States has led to like efforts to enforce rights against the government in a similar manner. And it must be confessed that, in regard to both classes of cases, the questions raised have rarely been free from difficulty, and the judges of this court have not always been able to agree in regard to them. Nor is it an easy matter to reconcile all the decisions of the court in this class of cases.
While no attempt will be made here to do this, it may not be amiss to try to deduce from them some general principles, sufficient to decide the case before us.
It may be accepted as a point of departure unquestioned, that neither a State nor the United States can be sued as defendant in any court in this country without their consent, except in the limited class of cases in which a State may be made a party in the Supreme Court of the United States by virtue of the original jurisdiction conferred on this court by the Constitution.
This principle is conceded in all the cases, and whenever it can be clearly seen that the State is an indispensable party to enable the court, according to the rules which govern its procedure, to grant the relief sought, it will refuse to take jurisdiction. But in the desire to do that justice, which in many cases the courts can see will be defeated by an unwarranted extension of this principle, they have in some instances gone a long way in holding the State not to be a necessary party, though some interest of hers may be more or less affected by the decision. In many of these cases the action of the court has been based upon principles whose soundness cannot be disputed. A reference to a few of them may enlighten us in regard to the case now under consideration.
1. It has been held in a class of cases where property of the State, or property in which the State has an interest, comes before the court and under its control, in the regular course of judicial administration, without being forcibly taken from the possession of the government, the court will proceed to discharge *452 its duty in regard to that property. And the State, if it choose to come in as plaintiff, as in prize cases, or to intervene in other cases when she may have a lien or other claim on the property, will be permitted to do so, but subject to the rule that her rights will receive the same consideration as any other party interested in the matter, and be subjected in like manner to the judgment of the court. Of this class are the cases of The Siren, 7 Wall, 152, 157; The Davis, 10 Wall. 15, 20; and Clark v. Barnard and others, 108 U.S.
2. Another class of cases is where an individual is sued in tort for some act injurious to another in regard to person or property, to which his defence is that he has acted under the orders of the government.
In these cases he is not sued as, or because he is, the officer of the government, but as an individual, and the court is not ousted of jurisdiction because he asserts authority as such officer. To make out his defence he must show that his authority was sufficient in law to protect him. See Mitchell v. Harmony, 13 How. 115; Bates v. Clark, 95 U.S. 204; Meigs v. McClung, 9 Cranch, 11; Wilcox v. Jackson, 13 Pet. 498; Brown v. Huger, 21 How. 305; Grisar v. McDowell, 6 Wall. 363.
To this class belongs also the recent case of United States v. Lee, 106 U.S. 196, for the action of ejectment in that case is, in its essential character, an action of trespass, with the power in the court to restore the possession to the plaintiff as part of the judgment. And the defendants, Strong and Kaufman, being sued individually as trespassers, set up their authority as officers of the United States, which this court held to be unlawful, and therefore insufficient as a defence. The judgment in that case did not conclude the United States, as the opinion carefully stated, but held the officers liable as unauthorized trespassers, and turned them out of their unlawful possession.
3. A third class, which has given rise to more controversy, is where the law has imposed upon an officer of the government a well defined duty in regard to a specific matter, not affecting the general powers or functions of the government, but in the performance of which one or more individuals have a distinct interest capable of enforcement by judicial process.
*453 Of this class are writs of mandamus to public officers, as in Marbury v. Madison, 1 Cranch, 137; Kendall v. Stokes, 3 How. 87; United States v. Schurtz, 102 U.S. 378; United States v. Boutwell, 17 Wall. 604.
But in all such cases, from the nature of the remedy by mandamus, the duty to be performed must be merely ministerial, and must involve no element of discretion to be exercised by the officer.
It has, however, been much insisted on that in this class of cases, where it shall be found necessary to enforce the rights of the individual, a court of chancery may, by a mandatory decree or by an injunction, compel the performance of the appropriate duty, or enjoin the officer from doing that which is inconsistent with that duty and with plaintiff's rights in the premises.
Perhaps the strongest assertion of this doctrine is found in the case of Davis v. Gray, 16 Wall. 203.
In that case, the State of Texas having made a grant of the alternate sections of land along which a railroad should thereafter be located, and the railroad company having surveyed the land at its own expense and located its road through it, the commissioner of the State land office and the governor of the State were, in violation of the rights of the company, selling and delivering patents for the sections to which the company had an undoubted vested right. The circuit court enjoined them from doing this by its decree, which was affirmed in this court.
Judge Hunt did not sit in the case, and Justice Davis and Chief Justice Chase dissented, on the ground that it was in effect a suit against the State. Though there are some expressions in the opinion which are unfavorably criticised in the opinions of both the majority and minority of this court in the recent case of United States v. Lee, the action of the court has not been overruled.
But it is clear that in enjoining the governor of the State in the performance of one of his executive functions, the case goes to the verge of sound doctrine, if not beyond it, and that the principle should be extended no further. Nor was there in that case any affirmative relief granted by ordering the governor *454 and land commissioner to perform any act towards perfecting the title of the company.
The case of the Board of Liquidation v. McComb, 92 U.S. 531, is to the same effect. The board of liquidation was charged by the statute of Louisiana with certain duties in regard to issuing new bonds of the State in place of old ones which might be surrendered for exchange by the holders of the latter. The amount of new bonds to be issued was limited by a constitutional provision. McComb, the owner of some of the new bonds already issued, filed his bill to restrain the board from issuing that class of bonds in exchange for a class of indebtedness not included within the purview of the statute, on the ground that his own bonds would thereby be rendered less valuable. This court affirmed the decree of the circuit court enjoining the board from exceeding its power in taking up by the new issue a class of State indebtedness not within the provisions of the law on that subject.
In the opinion in that case the language used by Mr. Justice Bradley well and tersely thus expresses the rule and its limitations:
"The objections to proceeding against State officers by mandamus or injunction are, first, that it is in effect proceeding against the State itself; and, second, that it interferes with the official discretion vested in the officers. It is conceded that neither of these can be done. A State, without its consent, cannot be sued as an individual; and a court cannot substitute its own discretion for that of executive officers, in matters belonging to the proper jurisdiction of the latter. But it has been settled that where a plain official duty requiring no exercise of discretion is to be performed, and performance is refused, any person who will sustain a personal injury by such refusal may have a mandamus to compel performance; and when such duty is threatened to be violated by some positive official act, any person who will sustain personal injury thereby, for which adequate compensation cannot be had at law, may have an injunction to prevent it."
It is believed that this is as far as this court has gone in granting relief in this class of cases. The case of Osborne v. *455 Bank of the United States, 9 Wheat. 738, often referred to, was decided upon this principle, and goes no further; for, in that case, a preliminary injunction of the court forbidding a State officer from placing the money of the bank, which he had seized, in the treasury of the State, having been disregarded, the final decree corrected this violation of the injunction, by requiring the restoration of the money thus removed. See Louisiana v. Jumel, 107 U.S. 711.
On the other hand, in the cases of Louisiana v. Jumel and Elliott v. Wiltz, 107 U.S. 711, decided at the last term, very ably argued and very fully considered, the court declined to go any further.
In the first of these cases the owners of the new bonds issued by the board of liquidation mentioned in McComb's case, above cited, brought the bill in equity, in the Circuit Court of the United States, to compel the auditor of the State and the treasurer of the State to pay, out of the treasury of the State, the overdue interest coupons on their bonds, and to enjoin them from paying any part of the taxes collected for that purpose for the ordinary expenses of the government. They at the same time applied to the State court for a writ of mandamus to the same officers, which suit was removed into the Circuit Court of the United States. In this they asked that these officers be commanded to pay, out of the moneys in the treasury, the taxes which they maintained had been assessed for the purpose of paying the interest on their bonds, and to pay such sums as had already been diverted from that purpose to others by the officers of the government.
The circuit court refused the relief asked in each case, and this court affirmed the judgment of that court.
The short statement of the reason for this judgment is, that as the State could not be sued or made a party to such proceeding, there was no jurisdiction in the circuit court either by mandamus at law, or by a decree in chancery, to take charge of the treasury of the State, and seizing the hands of the auditor and treasurer, to make distribution of the funds found in the treasury in the manner which the court might think just.
*456 The Chief Justice said:
"The treasurer of the State is the keeper of the money collected from this tax, just as he is the keeper of other public moneys. The taxes were collected by the tax collectors and paid over to him, that is to say, into the State treasury, just as other taxes were when collected. He is no more a trustee of these moneys than he is of all other public moneys. He holds them only as agent of the State. If there is any trust the State is the trustee, and unless the State can be sued the trustee cannot be enjoined. The officers owe duty to the State alone, and have no contract relations with the bondholders. They can only act as the State directs them to act and hold as the State allows them to hold. It was never agreed that their relations with the bondholders should be other than as officers of the State, or that they should have any control over this fund except to keep it like other funds in the treasury, and pay it out according to law. They can be moved through the State, but not the State through them."
We think the foregoing cases mark, with reasonable precision, the limit of the power of the courts in cases affecting the rights of the State or federal governments in suits to which they are not voluntary parties.
In actions at law, of which mandamus is one, where an individual is sued, as for injuries to person or to property, real or personal, or in regard to a duty which he is personally bound to perform, the government does not stand behind him to defend him. If he has the authority of law to sustain him in what he has done, like any other defendant, he must show it to the court and abide the result. In either case the State is not bound by the judgment of the court, and generally its rights remain unaffected. It is no answer for the defendant to say I am an officer of the government and acted under its authority, unless he shows the sufficiency of that authority.
Courts of equity proceed upon different principles in regard to parties. As was said in Barney v. Baltimore, 6 Wall. 280, there are persons who are merely formal parties without real interest, and there are those who have an interest in the suit, but which will not be injured by the relief sought, and there *457 are those whose interest in the subject-matter of the suit renders them indispensable as parties to it. Of this latter class the court said, in Shields v. Barrow, 17 How. 130, "they are persons who not only have an interest in the controversy, but an interest of such a nature that a final decree cannot be made without affecting that interest or leaving the controversy in such a condition that its final disposition may be wholly inconsistent with equity and good conscience."
"In such cases," says the court in Barney v. Baltimore, 6 Wall. 280, "the court refuses to entertain the suit when these parties cannot be subjected to its jurisdiction."
In the case now under consideration the State of Georgia is an indispensable party. It is in fact the only proper defendant in the case. No one sued has any personal interest in the matter or any official authority to grant the relief asked.
No foreclosure suit can be sustained without the State, because she has the legal title to the property, and the purchaser under a foreclosure decree would get no title in the absence of the State. The State is in the actual possession of the property, and the court can deliver no possession to the purchaser. The entire interest adverse to plaintiff in this suit is the interest of the State of Georgia in the property, of which she has both the title and possession.
On the hypothesis that the foreclosure by the governor was valid, the trust asserted by plaintiff is vested in the State as trustee, and not in any of the officers sued.
No money decree can be rendered against the State, nor against its officers, nor any decree against the treasurer, as settled in Louisiana v. Jumel.
If any branch of the State government has power to give plaintiff relief it is the legislative. Why is it not sued as a body, or its members by mandamus, to compel them to provide means to pay the State's indorsement?
The absurdity of this proposition shows the impossibility of compelling a State to pay its debts by judicial process.
The decree of the circuit court is affirmed.
*458 MR. JUSTICE HARLAN, with whom concurred MR. JUSTICE FIELD, dissenting.
The bill in this suit was filed by Cunningham, a citizen of Virginia, in behalf of himself and all holders of the second series of the bonds of the Macon and Brunswick Railroad Company, indorsed by the State of Georgia, who may choose to be made parties to the suit and share the expenses thereof.
The defendants are: The Macon and Brunswick Railroad Company, a corporation of Georgia; Edward A. Flewellyn, W.A. Lofton, and George S. Jones, citizens of Georgia, and styling themselves "Directors of the Macon and Brunswick Railroad;" J.W. Renfroe, treasurer, and Alfred H. Colquitt, governor of the State of Georgia, both citizens of that State; the First National Bank of Macon, a corporation created under the laws of the United States and located at Macon, Georgia, and John H. James, a citizen of Georgia.
The suit relates to the Macon and Brunswick Railroad, of which Flewellyn, Lofton, and Jones, as directors aforesaid, are in possession, and which they are managing and operating in entire disregard, as the bill alleges, of the rights of complainant and other holders of the before-mentioned bonds.
But the suit has other features of which no notice is taken in the opinion of the court. The bill alleges that on or about July 2d, 1873, the then governor of Georgia not only seized the railroad and all other property of the company, but certain other property embraced in a deed of trust to one Whittle, which was not covered by the statutory and executed mortgages, so far as the $1,950,000 series of indorsed bonds is concerned, because acquired by the company after the last of that series had been indorsed, with funds other than the proceeds of the bonds, but which was covered by the mortgages so far as the $600,000 series is concerned, having been bought prior to the indorsement of the latter bonds. The property covered by the deed of trust to Whittle was, the bill alleges, transferred to the trustees therein named, with directions to dispose of the same and with the proceeds to redeem certain fare-bills of the company; but said trust was never carried out by them, because those fare-bills were fully paid out of the earnings of the railroad.
*459 The bill charges that the sale at which the governor of Georgia purchased the property for the State was void:
1. "Because neither the legislature nor the governor had the right to exclude the $600,000 series of indorsed bonds from being used as so much cash, in the purchase of said road, at their face value  certainly they were entitled to be so used, in the event of the exhaustion of the $1,950,000, which themselves should have been received as cash at par."
2. "Because the governor was not authorized to bid on said property for the State, and the State had no constitutional power to make the purchase; or, if said sale is not void, it is certainly voidable, because, under the statutory and executed mortgages, the State is the trustee of the property mortgaged for the benefit of the bondholders, and had no right to buy at her own sale, as such trustee, without incurring the risk of having said sale set aside at the instance of any beneficiary under the trust, and your orator as such beneficiary, elects to set aside such sale."
The suit proceeds in part upon the general ground that the mortgages in question are mortgages to the governor of Georgia, as trustee for the bondholders, to secure the payment of the bonds indorsed by the State, and not mortgages of indemnity to the State to save her harmless against the liability incurred by her indorsement. If, however, the court should be of opinion that the mortgages are for the indemnity of the State, and that the sale of the railroad and purchase by the State are valid, then the complainant insists that both series of indorsed bonds stand upon an equal footing, and that the sums paid by the treasurer of the State, in taking up the coupons of the State bonds which have been exchanged for the $1,950,000 series of the Macon and Brunswick Railroad indorsed bonds, represent a portion of these proceeds, and should be paid pro rata upon both series of bonds; and that when the legislature of Georgia appropriates any sum for the principal of the State bonds so exchanged, such sum should in like manner be divided pro rata among the holders of both series of indorsed bonds, and that the State bonds so exchanged should themselves be treated as the proceeds of the sale of the railroad, and divided *460 pro rata among all the holders of both series of State indorsed bonds.
The case went off in the court below on demurrers and pleas which questioned the right of complainant to relief solely upon the ground that the suit was against the State, which was not, and could not be made, a party to the suit.
It is true, as stated in the opinion of the court, that the property to which the suit relates is in the actual possession of some of the defendants, who assert no individual claim thereto, but are acting for and on behalf of the State. It is also true that the apparent legal title to the property embraced by the mortgages, other than such as was covered by the deed to Whittle, stands in the name of the State. But the suit, as is quite clear, proceeds upon the ground that Georgia, by her officers, is not rightfully in possession, and that no valid title passed to the State by virtue of the sale in question. The issue is distinctly made by the bill, that the governor was not authorized to bid in the property, and that the State had no constitutional power to make the purchase. But the court declines or fails to consider or pass upon these questions. If the court had found that the sale under which the State claimed was valid, and that the governor had legal authority to make the purchase in virtue of which the officers of the State claim to be rightfully in possession in her behalf; or had it been adjudged that the complainant and those united in interest with him had no lien or claim upon the property, I should not, perhaps, have expressed any dissent, however much I may have differed with my brethren upon such questions. In other words, if the State was ascertained to be the lawful owner of and entitled to the possession of the property in question, I should recognize the legal difficulties in the way of enforcing a lien thereon for any purpose in behalf of others; for the enforcement of such lien would, in the case supposed, necessarily disturb the rightful possession of the State, which could not be sued against her will, and without whose presence in the suit a final comprehensive decree could not be passed.
But such is not the case before us. The case to be determined is that made by the bill. Its averments are admitted *461 by the demurrer and are not controverted by the pleas. They show that the property, although held by officers of the State, as her absolute property, is not rightfully so held. It is this aspect of the present decision which constrains me to dissent from the opinion of the court. If the citizen asserts a claim or lien upon property in the possession of officers of a State, the doors of the courts of justice ought not to be closed against him, because those officers assert ownership in the State. The court should examine the case so far as to determine whether the State's title rests upon a legal foundation. If that title is found to be insufficient, and if the State, claiming its constitutional exemption from suit, refuse to appear in the suit as a party of record, the court ought to proceed to a final decree as between the complainant and those who are in possession of the property, leaving the State to assert her claim in any suit she might bring. This must be so, otherwise the citizen may be deprived of his property and denied his legal rights, simply because the officers of a State take possession of and hold it for the State.
Such was the ruling of this court in United States v. Lee, 106 U.S. 196. That was an action to recover the possession of what was formerly known as the Arlington estate. The defendants held possession of the property in no other capacity than as officers and agents of the United States. The attorney-general of the United States appeared, and in due form gave the court to understand that the property in controversy was then, and for more than ten years had been, held, occupied, and possessed by the United States, through their officers and agents, as public property for public purposes, in the exercise of their sovereign and constitutional powers, namely, as a military station, and as a national cemetery established for the burial of deceased soldiers and sailors of the Union. Upon these grounds it was contended that no action could be maintained which would disturb the control of those who were in possession for the United States. The contention, in behalf of the government, was that the United States could not be sued without their consent, and that the maintenance of a suit against their officers and agents for the purpose of ousting them from the possession of the Arlington cemetery, would be *462 an encroachment upon the powers entrusted by the Constitution to the legislative and executive departments.
But to this argument the response of this court was: That under the American system of government the people, called elsewhere subjects, were sovereign; that their "rights, whether collective or individual, are not bound to give way to a sentiment of loyalty to the person of a monarch;" that "the citizen here knows no person, however near to those in power, or however powerful himself, to whom he need yield the rights which the law secures to him when it is well administered;" that "when he, in one of the courts of competent jurisdiction, has established his right to property, there is no reason why deference to any person, natural or artificial, not even the United States, should prevent him from using the means which the law gives him for the protection and enforcement of that right;" "that no man in this country is so high that he is above the law; no officer of the law may set that law at defiance with impunity; all the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it." Upon examination of the doctrine that, except where Congress has provided, the United States cannot be sued, we held that it had no application to officers and agents of the United States who, holding possession of property for public uses, are sued therefor by a person claiming to be the owner thereof or entitled thereto; but the lawfulness of that possession and the right or title of the United States to the property may, by a court of competent jurisdiction, be the subject-matter of the inquiry, and adjudged accordingly.
In the case just cited, we quoted, with approval, the language of Chief Justice Marshall, in United States v. Peters, 5 Cranch 115, where, speaking for the court, he said that "it certainly can never be alleged that a mere suggestion of title in a State to property in possession of an individual must arrest the proceedings of the court, and prevent them looking into the suggestion and examining the validity of the title."
In United States v. Lee, we also referred with approval to the decision in Osborne v. Bank of United States, 9 Wheat. 738. That was a suit by the Bank of the United States against the *463 auditor, treasurer, and other agents of the State of Ohio. The State, by its officers, levied a tax upon the bank, which it refused to pay. The State officer seized the money of the bank in payment of the tax, and delivered it to the treasurer of the State. The latter held it when the suit was brought, and the right of the State to hold the money in discharge of its taxes was the fundamental question in the case. The State was not made a party, because by the Constitution the judicial power of the United States did not extend to a suit against one of the United States by citizens of another State. It was conceded that the State was the real party in interest. That of which the bank complained were the acts of the defendants in their official character, and done in obedience to the statutes of Ohio. The contention, therefore, was, that as the State could not be sued, the suit must be dismissed. But to this the court, speaking by Chief Justice Marshall, replied:
"If the State of Ohio could have been made a party defendant, it can scarcely be denied that this would be a strong case for an injunction. The objection is that, as the real party cannot be brought before the court, a suit cannot be sustained against the agents of that party; and cases have been cited to show that a court of chancery will not make a decree unless all those who are substantially interested be made parties to the suit. This is certainly true where it is in the power of the plaintiff to make them parties; but if the person who is the real principal, the person who is the true source of the mischief, by whose power and for whose advantage it is done, be himself above the law, be exempt from all judicial process, it would be subversive of the best established principles to say that the laws could not afford the same remedies against the agent employed in doing the wrong which they would afford against him could his principal be joined in the suit."
The relief asked was granted without the State becoming a party to the record.
In United States v. Lee, the language just quoted from Osborne v. Bank of United States, was distinctly approved, and the adjudged cases were held to show that the proposition, *464 that when an individual is sued in regard to property which he holds in his capacity as an officer or agent of the United States, his possession cannot be disturbed when that fact is brought to the attention of the court, has been overruled and denied in every case where it has been necessary to decide it.
In my judgment it is impossible to reconcile the decision here with the ruling in the Arlington case. As I concurred in the opinion and judgment in the latter case, I am constrained to withhold my assent to the present decision. In United States v. Lee, the judicial power was deemed ample to oust officers of the United States from the possession of property claimed by them, not as individuals, but as the representatives of their government. The possession of the government, by its officers, did not prevent the court from inquiring into the alleged title of the United States, and from awarding possession to those who claimed it as their property. But, in the case before us, the State of Georgia is allowed an exemption which the court did not feel at liberty to extend to the United States. The claim of complainant is, that he and others holding bonds indorsed by that State have a lien upon property in the possession of certain individuals. The latter assert a valid, complete title and the right of exclusive possession in the State. But the complainant contends that the alleged title of the State is not good in law; that the sale, in virtue of which the State asserts title and holds possession, was not a valid sale; that in any event the State, or her governor, holds the title merely as a trustee for others.
In effect, my brethren say that they will not determine these matters, and that because it appears that the State is the substantial party in interest, and that the defendants are only her officers, in possession in her behalf, the complainant and those united in interest with him must go out of court. It seems to me that the grounds upon which the Court proceeds would have led to a different conclusion, not only in United States v. Lee, but in all the prior decisions therein referred to as authority for the judgment in that case.
The court say that the judgment in United States v. Lee did not conclude the United States. So it may be said here, *465 that no decree rendered would have concluded the State of Georgia, had she declined to appear in the suit. But as in the former case the court did not decline to give relief because of the mere assertion of title in the United States, so in this case the mere assertion of title in the State should not have prevented an adjudication as to complainant's claim. Had the court ascertained that the property in contest was in the rightful possession and control of the State, then, but not before, the question would have arisen whether the bill must not be dismissed, so long as the State refused to become a party to the suit.
The court in its opinion reviews numerous cases other than those I have referred to, and states the principles upon which, in its judgment, they were decided. I content myself with saying that the correctness of that review is not conceded.
Limitations and qualifications are now placed upon former decisions which their language, I submit, does not justify. A doubt is now expressed as to whether Davis v. Gray, 16 Wall. 215, did not go beyond the verge of sound doctrine; this, notwithstanding the decision in the Arlington case was made to rest largely upon Davis v. Gray. In the Arlington case, we quoted from Davis v. Gray, a suit in equity, the following statement of the doctrine applicable to suits in the determination of which a State is interested:
"Where the State is concerned, the State should be made a party if it can be done. That it cannot be done, is a sufficient reason for the omission to do it, and the court may proceed to decree against the officers of the State in all respects as if the State were a party to the record. In deciding who are parties to the suit, the court will not look beyond the record. Making a State officer a party does not make the State a party, although her law may have prompted his action, and the State may stand behind him as a real party in interest. A State can be made a party only by shaping the bill expressly with that view, as where individuals or corporations are intended to be put in that relation to the case."
The only comment made, in the Arlington case upon this language was "that though not prepared to say now that the *466 court can proceed against the officer, in all respects, as if the State were a party, this may be taken as intimating in a general way the views of the court at that time."
But I especially dissent from the statement by the court of the question involved in Louisiana v. Jumel, 107 U.S. 711. Had the court there denied the relief asked upon the sole ground that granting it would be "to take charge of the treasury of the State, and, seizing the hands of the auditor and treasurer, to make distribution of the funds found in treasury in the manner which the court might think just," I should not, in that case, have expressed any dissent from the action of my brethren. I am unwilling by silence to accede to the suggestion that the substantial relief asked in Louisiana v. Jumel, could not have been granted without taking charge of the treasury of the State. There were in the hands of the treasurer of Louisiana money raised by taxation under certain constitutional and statutory provisions. It was money which, by contract with creditors of the State, was set apart and appropriated to the payment of the interest due on designated bonds of the State. The records of the State treasurer's office showed the exact amount obtained by taxation for that purpose. It was in the power of the officers of the State to have paid that money out in discharge of her contract obligations without the slightest confusion in the accounts of the State treasurer. The contrary was not claimed by those officers. But the treasurer and other officers declined to apply the money in their hands for the purposes to which it had been dedicated. They rested their refusal upon an ordinance passed by the State, which was conceded on all hands to be in palpable violation of the Constitution of the United States, and therefore null and void. As a reason for not discharging a plain official duty imposed by law, those officers referred to a void provision in the Constitution of Louisiana, and it was held that there was no power in the courts of the Union to compel the performance of that duty. This court declined to give any relief against the State officers of Louisiana, partly upon the ground that the relief asked "will require the officers, against whom the process is issued, to act contrary to the positive *467 orders of the supreme political power of the State, whose creatures they are, and to which they are ultimately responsible in law for what they do." "They must," proceeded this court, "use the public money in the treasury and under their official control in one way, when the supreme power has directed them to use it in another, and they must raise more money by taxation, when the same power has declared that it shall not be done." Thus the Constitution of the United States, which is the supreme law of the land, anything in the Constitution or laws of any State to the contrary notwithstanding, was, as I then thought and still think, subordinated to "the supreme political power" of the State of Louisiana.
My brethren declare it to be impossible to compel a State to pay its debts by judicial process. As no decree was asked against the State on the bonds held by complainant, and since the State was not made a party to the record, it is difficult to perceive why it was deemed necessary to make this declaration. But if, by that declaration, it was meant that no State can be sued as a party to the record, and no judgment rendered against it as a party defendant, the proposition will not be disputed. I submit, however, that under our system of government the citizen may demand that the courts shall determine his claim to, or his alleged lien upon, property, by whatever individuals that property may be held, and that he cannot be denied an adjudication and enforcement of that claim merely because the individuals sued assert right of possession and title in the government they represent. The hardship and injustice of a different rule is well illustrated in the present case, especially as respects the property embraced by the deed of trust to Whittle. The bill alleges, and the demurrer admits, that that property was not covered by the statutory and executed mortgages upon which the State rests its claim. If these averments are true, the State of Georgia has no pretence of right, by its officers, to hold that property. But my brethren adjudge  if I do not misapprehend the opinion  that the assertion by defendants of title in the State is sufficient to preclude judicial inquiry into the rightfulness of their possession or the validity of the State's title.
*468 My brethren say that "on the hypothesis that the foreclosure by the governor was valid, the trust asserted by plaintiff is vested in the State as trustee, and not in any of the officers sued." But, may not the court inquire whether that hypothesis be sound? Must it be assumed to be sound because the officers of the State so declare? Besides, if the alleged trust was vested in the State as trustee  if, as claimed by complainant, the State became the trustee of the property mortgaged for the benefit of the bondholders  may not the court proceed to a decree as between the parties to the record? If the trustee cannot be made a party, and refuses to appear, the court ought not, for that reason, to permit the interests of others to be sacrificed.
If the officers of the United States may be deprived of the possession of property held by them for the government, but the title to which is judicially ascertained, in an action against them only, not to be legally in the United States, I do not see why the courts may not, at the suit of the citizen, enforce his claims upon property as against officers of a State, who may be judicially ascertained, in a suit against them, not to be in rightful possession for such State. Such relief would not conclude the rights of the State, but would leave to her the privilege of asserting her claim in any court of competent jurisdiction.
I am authorized by MR. JUSTICE FIELD to say that he concurs in this opinion.