# GEORGE L. ELKINS

*v.*

# PEOPLE OF PORTO RICO.

San Juan, Law, No. 622.

1. Porto Rico is to all intents and purposes a territory of the United States, although "not a territory incorporated into the United States." It is quasi sovereign in character, and, as it in a large measure originates and changes its own laws, it possesses the same sovereign attributes as other territories and quasi sovereignties, and therefore cannot be sued without its consent.

2. Section 7 of the organic act (Foraker law) of Porto Rico, providing that certain classes of persons who continue to reside in the island ". . . shall constitute a body politic under the name of the People of Porto Rico, with governmental powers as hereinafter conferred, and with power to sue and be sued as such" [31 Stat. at L. 79, chap. 191], is intended merely to give a political status to the people of the island, and does not take away any of the usual sovereign attributes from the government thus created, such as exemption from suit, save with its own consent.

3. The question whether a government has permitted itself to be sued cannot always be raised by demurrer. In many cases it may be necessary to call for an answer, or hear the proofs, before it can be determined whether the facts bring the case within the terms of the statute that permits the government to be sued.

Opinion filed September 7, 1909.

NOTE.—*State.*—As to suits against state and United States, see notes to Beers v. Arkansas, 15 L. ed. U. S. 991, and Hans v. Louisiana, 33 L. ed. U. S. 842.

*Messrs. Sweet & Wilcox,* attorneys for the plaintiff.

*The Attorney General of the island,* for the defendant.

RODEY, Judge, delivered the following opinion:

This is an action at law for damages laid in the sum of $5,800 which plaintiff, a citizen of the United States, claims he suffered by reason of the destruction of his automobile worth $800, and personal injury to himself, which he fixes at $5,000. The complaint sets out that the injury occurred on the 23d day of December, 1908, by reason of the motor car in which plaintiff was riding, along a public road of the defendant near Bayamon, colliding with a telegraph wire that was negligently stretched, or hanging, across the road only about a foot above the ground. The machine was going at a speed of about 25 miles an hour at the time and, by being caught by the wire, was completely demolished, and the plaintiff himself was so severely shocked and injured as that he claims he has been subject to sciatic rheumatism as a consequence thereof, and is liable to continue to be so afflicted during the remainder of his life. The telegraph wire belonged to the insular telegraph system, that is owned and operated by the defendant, the people of Porto Rico.

The insular government through its Attorney General demurs to this complaint on the ground, (1) that the court has no jurisdiction because the defendant is a sovereign, and without its consent cannot be sued; (2) because the court has no jurisdiction over the subject-matter of the action, as it appears from the face of the complaint that the amount in dispute does not ex-

ceed, exclusive of interest or costs, the sum or value of $1,000; (3) because it clearly appears from the face of the complaint that the damage, if any, arose from the act of an official to whom it properly pertained to do the act or work performed, and not by the defendant acting through a special agent; and (4) because the defendant, being a quasi sovereign, is not in any event in law liable for the negligent acts or omissions of its employees.

This squarely raises the issue as to whether the people of Porto Rico, at least in this sort of a case, can be sued without their consent; and whether, as to this particular suit, they have, in fact, by law given their consent; and whether they can be sued in this court. It is admitted that heretofore they have, in fact, many times been sued in this and the insular courts, but it is insisted that this was always with their consent. The Supreme Court of the United States has, in a long line of decisions, held to the doctrine that a state or sovereign government cannot be sued without its consent. In Smith v. Reeves, 178 U. S. 448, 44 L. ed. 1146, 20 Sup. Ct. Rep. 919, Mr. Justice Harlan, speaking for the court and quoting from a previous case, used this language: " 'It may be accepted as a point of departure unquestioned,' said Mr. Justice Miller, in Cunningham v. Macon & B. R. Co. 109 U. S. 446, 451, 27 L. ed. 992, 994, 3 Sup. Ct. Rep. 292, 'that neither a state nor the United States can be sued as defendant in any court in this country without their consent, except in the limited class of cases in which a state may be made a party in the Supreme Court of the United States by virtue of the original jurisdiction conferred on this court by the Constitution.' "

A little over two years ago, in Kawananakoa v. Polyblank,

205 U. S. 349, 51 L. ed. 834, 27 Sup. Ct. Rep. 526, which was a case that came up from the territory of Hawaii, the Supreme Court of the United States, speaking through Mr. Justice Holmes, again affirmed this well-known doctrine, and holds that it is applicable to territories. This is its language: "A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends. . . . As the ground is thus logical and practical, the doctrine is not confined to powers that are sovereign in the full sense of juridical theory, but naturally is extended to those that in actual administration originate and change at their will the law of contract and property, from which persons within the jurisdiction derive their rights. A suit presupposes that the defendants are subject to the law invoked. Of course, it cannot be maintained unless they are so. But this is not the case with a territory of the United States, because the territory itself is the fountain from which rights ordinarily flow. It is true that Congress might intervene, just as in the case of a state, the Constitution does, and the power that can alter the Constitution might. But the rights that exist are not created by Congress or the Constitution, except to the extent of certain limitations of power. The District of Columbia is different, because there the body of private rights is created and controlled by Congress, and not by a legislature of the District. But for the territory of Hawaii, it is enough to refer to the organic act" (act of April 30, 1900, chap. 339, §§ 6, 55, 31 Stat. at L. 141, 142, 150).

See also the note to Carr v. State, 11 L.R.A. 370, where the question of the exemption of a sovereign from suit receives careful consideration.

Elkins v. People.

Now the question is,—admitting as we must, under the law and under the holding of the Supreme Court of the United States, as aforesaid, that a sovereign is exempt from suit,—Is Porto Rico a sovereign, or even a quasi sovereign, in the sense referred to; or has Congress in and by the organic act specifically taken the exemption from suit without its consent attribute away from it; or has the insular government itself, by its laws, permitted itself to be sued in any or all cases without its consent?

Section 7 of the Foraker law (31 Stat. at L. 79, chap. 191), which is the organic act of the island, provides that certain classes of inhabitants and their children continuing to reside in Porto Rico after April 11th, 1899, shall assume a new status, the words used being ". . . and they, together with such citizens of the United States as may reside in Porto Rico, shall constitute a body politic under the name of the People of Porto Rico, with governmental powers as hereinafter conferred, and with power to sue and be sued as such."

This organic law, which consisted originally of more than forty sections, and which has several times since been amplified and amended, created for Porto Rico what, in our judgment, is a fairly complete system of territorial government, consisting of the usual three branches more or less co-ordinate in their functions, with a governor, a bicameral legislature, although one of the houses is given certain powers to the exclusion of the other, and a complete insular judicial system. The act also established this court, with the jurisdiction of a district and circuit court of the United States somewhat amplified.

This organic law left all of the very elaborate system of

Spanish laws and codes in force that had not been changed by
military orders during the military occupation of the island,
or that were not changed by the terms of the organic act itself.
The island has proceeded thereunder for nearly ten years last
past, in the exercise of governmental functions as fully, to all
intents and purposes, as does any other territory or depend-
ency of the nation, notwithstanding that the native people of
Porto Rico have not yet been made citizens of the United
States, and notwithstanding that Porto Rico, according to the
Supreme Court of the United States, has not yet, as a terri-
tory, been incorporated into the United States. Furthermore,
the island has adopted a complete modern code of civil pro-
cedure, and has modified the Spanish political, criminal, com-
mercial, civil, and other codes and systems of laws that were in
force at the time of American occupation, to the extent made
necessary by the change in sovereignty and the system of gov-
ernment. Besides this, during some half a dozen sessions of the
local assembly, a series of somewhat elaborate session laws,
modeled to a considerable extent on American ideals, have
been enacted.

It will be seen by § 13 of the Foraker law, that all the pub-
lic property which was acquired in Porto Rico by the United
States, under the treaty of Paris, was placed under the control
of the Porto Rican government to be administered for the
benefit of the people, and later, on July 1st, 1902 (32 Stat. at
L. 731, chap. 1383), Congress passed an act authorizing the
President to reserve certain public buildings and property in
Porto Rico for national purposes, and granted to the "govern-
ment of Porto Rico," all other property which the nation had
received from Spain under the treaty of Paris. This direction

was thereafter duly carried out by the President (see our opinion in United States v. Hernandez, 2 Porto Rico Fed. Rep. 81). So the government of Porto Rico is now the owner of such unreserved public property in the island in trust for the people. Congress itself interferes very little with the affairs or laws of the island, save when obliged to do so, as by the recent failure of the assembly to pass the budget for the present fiscal year, but leaves the local legislative assembly to adopt, repeal, or modify laws as it shall deem best, within the limitations of the organic law and the Constitution of the United States.

It will be seen that the Supreme Court of the United States in the Polyblank Case, supra, held that a territory itself is the fountain from which rights ordinarily flow. We have heretofore held that Porto Rico, for all practical purposes, is a territory of the United States. Peck S. S. Line v. New York & P. R. S. S. Co. 2 Porto Rico Fed. Rep. 109. In this position we are, we think, sustained by the recent decision of the Supreme Court of the United States in New York ex rel. Kopel v. Bingham, 211 U. S. 476, 53 L. ed. 289, 29 Sup. Ct. Rep. 190, where, in extradition proceedings on the demand of the governor of Porto Rico to the governor of the state of New York, it was held that "it may be justly asserted that Porto Rico is a completely organized territory, although not a territory incorporated into the United States, and that there is no reason why Porto Rico should not be held to be such a territory as is comprised in § 5278, U. S. Comp. Stat. 1901, p. 3597."

It will not do to say, as counsel for plaintiff virtually does, that because Congress permitted the Spanish laws to remain in force by the terms of the organic act it just simply itself

Elkins v. People.

adopted a system of laws for the island, and hence the full literal meaning must be given to the "sue and be sued" clause of the act, and that therefore Porto Rico is on a par with any ordinary municipality, or perhaps with the District of Columbia, where Congress directly enacts all local laws, and delegates no power to pass laws to any legislative assembly. The direct contrary of this contention was held to be the law by the Supreme Court of the United States in Ortega v. Lara, 202 U. S. 339, 50 L. ed. 1055, 26 Sup. Ct. Rep. 707. It was there held that the Spanish laws left in force by the organic act are laws of Porto Rico, and not laws of the United States, at least for jurisdictional purposes.

The difference between the two situations is that here in Porto Rico there exists a complete system of local government, and the local legislature itself makes, modifies, and repeals laws of all kinds, not inconsistent with the national limitations above pointed out. Hence in our opinion, Porto Rico, in its actual administration, does originate and change at its will the law of contracts and property from which persons within the jurisdiction derive their rights, and for this reason, in this regard, is, we submit, as much sovereign, or at least as much entitled to sovereign attributes as any of the territories that are held to be incorporated into the United States. In fact, as to many things it is even more sovereign and more favored than are the continental territories, as, for instance, in thus owning the unreserved public property, in having a so-called district court of the United States as a part of its judicial system, and in having a gift made to it, for its own use, of all the customs duties, and internal revenues, and other large sums of money annually. Besides its local courts appear to be conceded, or,

at least, have for years assumed without question, the very extraordinary power of granting "dominio titles" to what may be public land of the people,—a power which the courts of no continental territory have even assumed to exercise, as under the American government Congress alone can deed away the public domain. This power is surely of a sovereign character.

Therefore it would not appear to be reasonable to suppose that Congress intended Porto Rico to be in the situation of a mere municipal corporation, subject to the ordinary rules that govern laws of procedure between private persons, as was held with reference to the District of Columbia in Metropolitan R. Co. v. District of Columbia, 132 U. S. 1, 33 L. ed. 231, 10 Sup. Ct. Rep. 19. Under the circumstances it seems to us that it ought not to be presumed, in the absence of positive legislation making it so, that Congress intended the more than a million people who reside in the island, and who are, in point of time, so far away from the national seat of government, to be put or left in such a position. If they are left in that situation then Congress went to a lot of unnecessary trouble in establishing an elaborate system of territorial government for them. Of course, no one doubts that even though a sovereignty or quasi sovereignty cannot ordinarily be sued without its consent, still it can and often does waive its privilege, and gives its consent to be sued, as it is contended has been done in this case, to which we will hereafter refer.

We repeat, did Congress by the use of the language above quoted, wherein is said that the people of Porto Rico shall constitute a body politic "with power to sue and be sued as such," intend to entirely, or to any extent, take away from the Porto Rican government the usual and valuable attribute of all other

quasi sovereignties—to be exempt from suit save with its own consent?

We have not at hand facilities for examining the exact text of the organic acts of the several territories of the United States since the beginning of our government, but, from our recollection of them, we are inclined to think that no other organic act than that of Porto Rico contains language specifically "granting" the people of the territory the power to sue and be sued. The power to sue was no doubt always assumed as being an inherent attribute of the new government thus created, and the power or right to be sued in proper cases was usually granted or permitted in proper cases by the territorial governments themselves. Congress has and always retains final power in its own hands over all territories, which can be invoked at any time to check abuses if any take place. Yet it is contended that Congress has, by the use of the words referred to, subjected the people of Porto Rico, as a government, to the unrestricted claims and demands of all litigants that choose to call it into court. Is this the necessary import of the words, or the intention of Congress, as gathered from the whole act? Should we not take into account the purpose of Congress in creating a government for Porto Rico? And if this is done, is it not possible, and does it not follow, that we must, without reading anything into or taking anything out of the act, hold that the language referred to simply confers power that makes it possible for the island, as a body politic, to sue and to be sued when it as a government, by its own laws, permits itself to be sued, as all governments must of necessity to some extent do?

In other words, to permit it to be sued when it shall waive its privilege. To put it differently, was it not the intent of

Elkins v. People.

Congress, by the use of this language, to simply give the people of Porto Rico a legal status as a body politic, because they had no such status after the Treaty of Paris, and before the date of the organic act, a period of about a year, but were in charge of the military branch of the government. During the military government the people of Porto Rico had no political status in the ordinary sense. As an entity they could not as and of themselves either sue or permit themselves to be sued. They did not exist as a legal body politic or as a government. If Congress had intended to go farther than as we are here contending, would it not have provided the tribunals in which the suits could be brought, and would it not have provided how judgments recovered could be enforced? The framers of the Foraker law well knew that, where a sovereignty or quasi sovereignty is to be sued, there must be some mode of enforcing the judgment. It would be a violent presumption under our system of government, even if plaintiff's contention is right, to hold that any court in Porto Rico, under the mere words of the organic act, could go farther than to render a judgment against the local government, leaving it to the legislative assembly thereafter to provide funds to satisfy it. Could the courts, as with mere municipal corporations, mandamus the officials to levy a tax to pay such a judgment? To even think of such a thing as against the power that makes the laws is preposterous. The courts can and often do mandamus governmental accounting officers to draw warrants and pay money on a proper showing when the duty is strictly a ministerial one, but not otherwise. The legislative assembly alone, or in some cases its equivalent, the executive council and the governor, can take money out of the insular treasury, or divert it to the

V. Porto Rico—8.

Elkins v. People.

payment of particular claims. The courts have no such power. They cannot make laws; they must administer the law as they find it. We can see no reason why persons in Porto Rico, the same as elsewhere, who have claims against the local government in cases where it has not permitted itself to be sued, cannot get redress at the hands of the legislative assembly by making direct application thereto. It ought not to be presumed that the assembly here, any more than in any other territory, would deny them their just demands.

Can it be said that the language of the original act we are referring to would empower any court to control the discretion of the local legislature, or of any of its officials, or that it was intended to give the courts, which are simply a co-ordinate branch of the government, any other or different rights as against the government itself than they have anywhere else? Would it be sound reasoning to contend, even under the organic act in question, that the courts have or were given any such other or different rights?

While it can be argued that the courts could on demurrer properly discriminate with reference to the right to sue the island, and exclude garnishments and other proceedings where the government was not interested, still if the words mean what it is claimed they do, it might even be contended that the salaries of the officials of the government are subject to garnishment; the result would be that a large part of the time of public officials would be wasted in litigation in which the island had no concern. The direct contrary was, and, as we think, properly, held regarding Re Garnishment of Pay of Member of Legislature in 1 Porto Rico Fed. Rep. 405, and as to municipal funds in Horton v. Aguadilla, 1 Porto Rico Fed. Rep.

Elkins v. People.

459. See also 1 Ops. Atty. Gen. P. R. pp. 75–180. Were such the fact, the island's government would be nothing more than is the veriest private corporation, instead of a quasi sovereign government legislating for nearly a million and a third of people.

If the people of Porto Rico as a body politic, or as a government, do not possess the quasi sovereign or sovereign attribute of exemption from suit without their consent, then we can see no reason why the government should not be liable to suit at the hands of every person who may claim to have been injured by it. Every person who was wrongfully prosecuted, every person who was assaulted by a policeman, and every person who had his property sold for taxes without the strictest compliance with every letter of the law, would, forsooth, have an action against the government. The conditions that would ensue as a result can be imagined. A large portion of the time of the courts of the island, and of its officials, would be consumed in defending suits against the people. A situation can be imagined when judgments given in the lower courts against the government would swamp the supreme court of the island, and, in case that tribunal should affirm many of them, a large portion of the revenues of the island might be diverted in the payment of damages. By thus distorting possibilities, one can the more easily see that Congress, when creating the local government, never intended that such a condition of things should result. On the contrary, it is our opinion that it intended to, and did, create an orderly system of government with quasi sovereign powers and attributes, and not a mere municipal corporation with the rights only of an individual.

Of course it is well known that even the government of the

United States permits itself in many cases to be sued (see the Tucker act, March 3d, 1887, 24 Stat. at L. 505, chap. 359, U. S. Comp. Stat. 1901, p. 752), and for such purpose has established the court of claims, and many commissions, to determine the rights of citizens and others against it, but it always remains for Congress itself to appropriate the money to pay such judgments after they are rendered. We are not aware that any real hardship has ever arisen to the people of the several states and territories because of this exemption of their own several governments from suit without its consent. It is well known that, whenever government officials, state or Federal, attempt to do anything under an unconstitutional law, or that would in any manner deprive a citizen of his property without due process of law, courts interfere to protect such citizen against such particular officer, and such protection is not held to be a suit against the state or government. It is well known that, whenever government officers are wrongfully in possession of, or attempt wrongfully to take, real estate belonging to citizens the latter can sue, or enjoin, or eject them as individuals, even though they hold the property, or attempt to take it, or keep it, only as agents of the government. See our opinion in Compañia de los Ferrocarriles v. Rohrer, 3 Porto Rico Fed. Rep. 123, and the opinion in the same case on final hearing in 4 Porto Rico Fed. Rep. 145, and cases cited. As stated, Congress, as to all territories, is supreme and can at any time correct any hardships that may arise. But the power to thus enjoin or eject government officers, in the protection of the rights of a citizen, is an entirely different thing from holding that a quasi sovereign, without its consent, is subject to suit at the hands of every person who may have a claim of any

kind or character against it. We think that in construing the organic act of a territory the whole act must be taken into consideration, and no single section should be segregated. Carter v. Gear, 197 U. S. 348, 49 L. ed. 787, 25 Sup. Ct. Rep. 491.

It is not usual for courts of a particular territory or state to consider as binding authority the rulings of a sister territory or state, regarding laws enacted by or specifically affecting the first-mentioned jurisdiction, but the reasoning used is often available and instructive. In this regard we may cite the case of Richmond v. Porto Rico, decided in the supreme court of New York, in June, 1906, and reported in 51 Misc. 202, 99 N. Y. Supp. 743. In that case Giegerich, J., when one phase of the question we are here considering was squarely presented, held that, although Porto Rico under its organic act is possessed of only limited subordinate governmental powers, nevertheless it possessed sufficient of the qualities of sovereignty to exempt it from liability to the process and jurisdiction of the courts of that state. The effort there was to subject Porto Rico to suit in a New York court by service of process upon Hon. Beekman Winthrop, its governor, while on a trip to New York city. In arriving at its conclusion that court cites a well-known line of cases, where it is held, as to other territories, that they are exempt from suit without their consent, although none of them were considered with the care or reasoned on as broad lines as we think the importance of the subject required. Some of the cases are: Territory v. Doty, 1 Pinney (Wis.) 396; Beachy v. Lamkin, 1 Idaho, 50; Langford v. King, 1 Mont. 33; Fisk v. Cuthbert, 2 Mont. 593; Riddick v. Amelin, 1 Mo. 5; Baxter v. State, 9 Wis. 38; 28 Am. & Eng. Enc. Law, 2d ed. p. 57, etc.

After an examination of the subject we ascertain that the insular government, independent of anything contained in the organic act, does, in fact, permit itself to be sued in a variety of cases. Subsection 4 of § 1804 of the Civil Code, which is an exact copy of § 1904 of the previous Spanish Code of Porto Rico, provides in cases of negligence or culpa that "the state is liable in this sense when it acts through a special agent, but not when the damage should have been caused by the official to whom properly it pertained to do the act performed, in which case the provisions of the preceding section (that is that the party himself must respond) shall be applicable."

We find also that sub-sec. 2 of § 79 of the new, modern American Code of Civil Procedure of 1904 provides that "an action against a public officer, or persons especially appointed to execute his duties, for any act done by him in virtue of his office, or against a person who, by his command or his aid, does anything touching the duties of such officer, must be tried in the district where the cause or some part thereof arose." And the succeeding § 80 provides that "an action against the people of Porto Rico may be commenced and tried in any district in which the cause of action arises."

But, independent of anything we may have said in the foregoing short review of this important question, we think that the particular issue here is settled by the provision of § 404 of the Political Code of 1902, which reads as follows: "That the people of Porto Rico shall be liable for injuries to persons or property occurring through a defect or want of repair, or of sufficient protection, in or upon an insular highway in charge of the bureau of public works, except where it shall be proved that such defects were caused by violence of the

Elkins v. People.

elements, and that there had not been ample time to remedy them."

After a careful inspection of it we are inclined to believe that the provisions in this section, which holds the people of Porto Rico liable for injuries occurring for want of sufficient protection in or upon an insular highway in charge of the bureau of public works, is a sufficient reason for overruling the demurrer in this case, and leaving it to the defendant to prove if it can, on the trial, that the injury was caused by the violence of the elements, and that there had not been ample time in which to remedy the defects in or upon the highway.

We cannot see but that permitting a wire (especially when the wire is part of the equipment of the insular government's own telegraph system) to drop down over a highway so as to be a menace to the public using the road, is a "want of sufficient protection in or upon an insular highway;" and if the fact of the wire being there cannot be ascribed to the violence of the elements in the way indicated it would seem as though the plaintiff ought to have a right to recover under the section of the law last above quoted. We, of course, might have decided this issue by writing a single page, if § 404 of the Political Code, aforesaid, really applies, but, as that can only be determined after the proofs are in, we were constrained to review the matter somewhat at length, as we have here done, and to hold generally, which we do, that under the law, as it now stands, the people of Porto Rico cannot be sued without their consent.

How the judgment (if any is entered) can be enforced, if that becomes necessary, will be a question to be settled when it arises.

Although counsel for plaintiff indulges in some argument regarding it in his brief, we do not think the question as to whether the insular government has any right to conduct and maintain a system of insular telegraph lines is before us. An order will therefore be entered overruling the demurrer.