GEORGE G. McWHORTER, ENOCH J. VANN AND WILLIAM HIMES, AS THE RAILROAD COMMISSIONERS OF THE STATE OF FLORIDA, APPELLANTS, VS. THE PENSACOLA AND ATLANTIC RAILROAD COMPANY, APPELLEE.

1. The rule which forbids suit against officers of a State because in effect a suit against the State seems to apply only where the interest of the State is through some contract, or some property right, of hers, or where her interest is in a suit in her own name brought or threatened by her officers to enforce some alleged claim of hers.

2. Railroad Commissioners being authorized by statute to make reasonable rules and regulations for all railroads in the State, as to charges for transportation of passengers and freights, and to furnish each company with a schedule of charges made for its observance, and having fixed certain rates for one of the companies, which it deems not reasonable and just, said company filed a bill against the Commissioners to enjoin them from promulgating said rates, or any other rates substantially the same : *Held*, That this is not in effect a suit against the State ; but the statute having prescribed a penalty for violation of the rates fixed, and authorized the Commissioners to institute action in the name of the State to recover the penalty, in so far as the bill seeks to enjoin them from doing this, it is in effect a suit against the State.

3. Where the law invests an officer with discretion in the performance of an act, the courts will not interfere with or control his action by injunction. If injustice is done by his action, some other remedy must be sought. The statute gives these Commissioners discretion in making rates for railroads, and they are entitled to the benefit of this rule.

4. Whether rates made by the Commissioners are reasonable and just or not, even if subject to judicial control, is not open to enquiry in a suit to enjoin their discretionary action.

5. A statute conferring on a Commission authority to regulate the charges of railroads for transportation of passengers and freights, is not a delegation of legislative power forbidden by the Constitution of this State.

28

Appeal from the Circuit Court for Santa Rosa county.

The facts of the case are stated in the opinion.

*C. M. Cooper*, *Attorney-General*, for Appellants.

This appeal is taken from the order or decree of the Circuit Judge overruling the defendants' demurrer to the amended bill, and granting an injunction against the defendants, as such Railroad Commissioners, restraining them from " promulgating as binding upon the complainant the rates for transportation of freight and passengers heretofore prescribed by the defendants for the complainant, or other rates substantially the same as said rates, and from procuring or permitting the institution of any suits against the complainant for any alleged charges by the complainant in excess of the said rates heretofore fixed, or in excess of any other rates which may be fixed by the defendants for the complainant, substantially the same as the said rates." The case comes before this court on the amended bill, the demurrer thereto, the affidavit of the Commissioners, with the exhibits attached, in opposition to the granting of injunction, and the decree aforesaid.

I. This is a suit against the State and cannot be maintained, and the injunctional order is void. A suit cannot be brought against the State indirectly, any more than it could be so brought directly, and the fact that the State is not a party to the record does not answer the objection. Cunningham vs. Macon & Brunswick R. R. Co., 109 U. S., 446.

A suit to enjoin a State officer can be maintained only in a case where the officer can be proceeded against as an individual, though he be acting under the color of his office, as, for instance, where he is proceeding to the commis-

JUNE TERM, 1888.                    419

Railroad Commissioners v. P. & A. R. R. Co.—Argument of Counsel.

sion of a trespass for which he would be liable in damages, or in a case where the injunction is to arrest the improper performance of a mere ministerial act, such as could be directed by mandamus.    But a suit to enjoin an officer, acting as such, in any other case, is a suit against the State. *In re.* Ayers, 123 U. S., 443.

In the case now before this court it is evident that the Railroad Commissioners have no personal interest in the suit; that they are enjoined from the performance of official duties not ministerial, but especially discretionary, and that no action would lie against them personally concerning the performance of these duties.    5 Wait's Actions and Def., p. 35, Sec. 3 ; Cooley on Torts, 376 ; Board of Liquidation vs. McComb, 92 U. S., 541.

And it may be added that the decree in this case is an attempt to arrest, by injunction, the administration of a most important branch and function of the Government, until the discretion vested in the Commissioners by law shall be exercised as the Circuit Judge, in his discretion, may deem proper or expedient, and includes the attempted enjoining of suits which, according to the statute, are to be brought in the name of the State, by the Attorney-General or State's Attorney, for the recovery of penalties which, when recovered, are to be paid into the public school fund.    As well might there be an injunction against the grand jury to restrain them from finding an indictment which might, in the Judge's opinion, not be sustained by the facts.

It is to be borne in mind that my present argument is, that, whether the Commission Act be constitutional or otherwise, and whether the actions of the Commissioners thereunder be injurious to the appellee or otherwise, that there can be no suit for injunction against the Commissioners in the premises, because that is a suit against the State.

420 SUPREME COURT.

Railroad Commissioners v. P. & A. R. R. Co.—Argument of Counsel.

If the railroad company has any legal defences, of course, it may set them up in defending an action instituted by the Commissioners, as any defendant may do in any action brought against him by the State.

II. Apart from the inability of the court to entertain this suit because of its being a suit against the State, there is no jurisdiction in a court of equity in the premises, and no equity in the bill, for the following reasons:

1st. The State has the right and power to regulate the rates of charges of common carriers, and such regulations are conclusive on the court; it is only in the absence of legislation tnat the courts can decide what are just and reasonable rates. Munn vs. Ill., 94 U. S., 113; Chicago, &c., R. R. Co. vs. Iowa, 94 U. S., 155; Peik vs. Chicago, &c., R. R. Co., id., 164; Chicago, &c., R. R. Co. vs. Ackley, id., 179; Ruggles vs. Ill., 108 U. S., 526.

2d. This power can be exercised by the Legislature through Commissioners. Stone *et al.* vs. Farmers' Loan and Trust Co., 116 U. S., 307; Tilley vs. R. R. Commr's of Ga., 4 Woods, U. S. Circuit Court Reps., 427; Georgia R. R. Co. vs. Smith *et al.*, Commr's, 70 Ga., 694.

3d. By section 30, Article XVI, of the Constitution of Florida, the Legislature is invested with full power to pass laws to prevent excessive charges by common carriers, or, rather, the power which the Legislature has, by common or general law, in the premises, is affirmatively declared. By virtue of its general legislative powers the Legislature has the right to pass laws fixing rates of charges of common carriers, or authorizing Commissioners to do so, and this provision of the Constitution affirms this power. The power to prevent excessive charges necessarily includes the power to declare and fix reasonable charges

4th. By Chapter 3746, the Legislature has vested the

power to make and fix just and reasonable rates of such
charges in Commissioners, and as the Legislature could fix
the rates absolutely, it could authorize the Commissioners
so to do.    If there is any exception to the absoluteness of
this power, (and I think there is no exception,) it is that if
the Commissioners should not attempt *bona fide* to exercise
their discretion, or to regulate and make reasonable rates,
but should by a bare and apparent *pretense*, amounting to a
*fraudulent* exercise of their powers, attempt to deprive the
railroad company of all remuneration, and attempt to do
that which, on its face, without further examination, it is
apparent is not an attempt to regulate but is a naked and
wilful confiscation, the railroad company might show such
facts in defence to an action brought against it—for in no
case could it maintain a suit for injunction against the
Railroad Commissioners to enjoin them from fixing rates.
But, in point of fact, no court has ever attempted to review
the exercise of the discretion of the Legislature, or of such
Commissioners, in fixing rates, or attempted in any way to
go behind such fixing of what is just and reasonable, and
the Supreme Court of the United States has many times
refused so to do, as is shown in the cases before cited.
What is said by Chief-Justice Waite in Stone vs. Farmers'
Loan and Trust Company, 116 U. S., as to the possible ex-
istence of some power of redress in the courts in such a case
of mere pretense, fraud and confiscation, apart from its be-
ing mere incidental *dictum*, refers only to a possible case,
such as, it is said in the old books, would authorize an En-
glish court to nullify an act of Parliament, as being so man-
ifestly against natural right as to be void—a case which
has never arisen and never will arise.    But the fact is that
this action of the Commissioners is the exercise of an ad-
ministrative function of government, under the authority
of the act of the Legislature, for which the courts are not

responsible and over which they have no control; as is also the case in the levying of taxes and in the exercise of many other governmental powers which are entrusted to the legislative or administrative departments of the government, and not to the judicial, and the remedy for any abuse of which is not with the courts, but is with the Executive or the Legislature or the people at the ballot box; and the safeguards against such imaginable, but merely imaginary abuses of the power of regulation which we are considering, are to be found, not in invasions of the other departments of the government by the courts, but in the existence of all those things which make a free and constitutional government possible—among which is the division of governmental powers and functions into executive, legislative and judicial, which division is as binding upon the judicial as upon the other departments.

5th. By section 6 of Chapter 3746, the schedule of the Commissioners is made "sufficient" evidence that the rates fixed thereby are just and reasonable. This makes such schedule conclusive evidence. *Prima facie* evidence may sometimes be sufficient, but evidence which is at all times sufficient is conclusive. Anything in addition to sufficient evidence is merely cumulative; nor can evidence which sufficiently establishes a fact be affected by evidence to the contrary. The synonyms of "sufficient," as given in Webster's Dictionary, are "enough," "adequate," "competent," "full," "satisfactory," "ample." Such evidence is certainly conclusive. Such is the construction of the act in Georgia. See Tilley vs. R. R. Commissioners of Georgia, 4 Woods, 427; 70 Ga., 694; State vs. Chicago, M. & St. P. Ry. Co. (Minn.), 37 N. W. Rep., 782.

So section 17 provides that the suits in the name of the State shall be brought for violation of the rules and regulations of the Commission, which also makes the fact that

the Commission rules have been violated conclusive to entitle the State to recover.

Questions as to the general power of the Legislature to make evidence conclusive do not arise in this case; for in the case of common carriers, it being established law that the Legislature has the absolute power to fix rates, and that it may exercise this power through its legal instrument, Commission, that it may make the fixing of rates by the Commission conclusive evidence that they are reasonable and just seems to follow and result as manifestly and necessarily as that the sum of two and two equals four, or any other mathematical demonstration.

6th. Apart from the lack of jurisdiction to entertain a suit which is in effect a suit against the State, and apart from the conclusiveness of the action of the Commission, under the statute, in fixing rates, an officer cannot be enjoined in the exercise of discretion given him by law. 2 High on Inj., Secs., 1309-11, 1240; Board of Liquidation vs. McComb, 92 U. S. 541.

It is sought here to enjoin the Commissioners from promulgating certain rates, or any like rates, as just and reasonable; which is merely an attempt, in a matter which is peculiarly one of judgment and discretion, to substitute the opinion and discretion of the Circuit Judge, to whom the law has given neither discretion nor jurisdiction in the matter, for the discretion of the Commissioners in whom the law has vested it. That it was never intended by the Legislature that the courts should act as boards of revisers as to the rates fixed by the Commissioners is evident, not only from the fact that no such power is given or reserved to the courts by the statute, but from the further fact that there were several propositions of the sort made in the

Legislature, and when the bill was pending, all of which were voted down. See Senate Journal, 430, 40, 59.

7th. It is alleged in the bill that said company has charged for transportation of passengers not more than five cents per mile, "the rate authorized by its charter." Counsel for appellee has never made any point as to any alleged legislative grant of authority to charge five cents per mile for a passenger, and in fact there is no such grant, as appears by reference to the act. See Chapter 3335, Acts of 1881.

The general grant of the right to make rates, fix tolls, &c., does not prevent the subsequent regulation thereof by legislation. 116 U. S. 307. Nor does the fact, where it is a fact, that, in the charter, the Legislature has fixed a maximum beyond which the corporation may not charge, prevent a subsequent Legislature from passing laws under which lower rates are fixed. 70 Ga., 694. The only case holding that a maximum in the charter prevents subsequent regulation of rates within the maximum, by the Legislature or by its authority, is a Mississippi case, (62 Miss., 607,) in which the maximum was attached to a special grant to the corporation of the right to make its own rates. I do not think this case well considered or decided, and the case in 70 Ga. is contra, but if the Mississippi case is right, it does not affect the case of appellee. The P. & A. R. R. Co. has no special grant by its charter of the right to fix rates, nor is there any contract with it by the State to that effect. The fact that the Legislature of 1881 limited the passenger fare of appellee to five cents per mile, clearly does not prevent a subsequent Legislature from making other regulations fixing a lower limit. This power of the Legislature, if it can be surrendered at all, can only be surrendered by the clearest words expressly doing so, and granting and contracting it away to the rail-

road company.   Not only are there no such words in appellee's charter, but there are no words of grant at all in the premises, but the section containing the five cents limitation is a limitation pure and simple.   If there should be any contention that by limiting the rate to five cents in one statute, the Legislature thereby contracted and granted away forever the right of all subsequent Legislatures to make any other or lower limitation, there being no words in the charter to express any such intention, it would hardly seem to require refutation.

III.  The allegations of the bill, even if the matter were within the jurisdiction of the court, are entirely insufficient to entitle the appellee to the relief therein prayed, or to any relief in equity.   These allegations of the bill, as amended, show no more than that appellee's railroad has not been a paying property, at rates for the transportation of passengers and freights higher than those fixed by the Commissioners.   It is true that it is alleged in the amendments, (p.    of record,) that, some two years ago, the rates for passengers charged by said company were lower than it now charges, and that it had received fifteen per cent. more of products for transportation of passengers since the increase of rates than it received before for the same time; also that some time since, it charged more on some classes of freight, not specified, than it now does, though it still charges more than the Commission rates, and that it receives less gross income from the lower rates.   The indefiniteness of these allegations is apparent.   Two or three years make much difference on the line of a new road, and perhaps lower passenger rates would now produce better results.   As to the freight rates, it is not shown what they are now or have been at any time.   The court actually granted this injunction without any allegation or showing

of what the rates charged by this road are—they may be wholly extortionate and prohibitory for anything that appears. The only information we have concerning them is that the rates charged for passengers do not exceed five cents per mile, and the freight rates are higher than the Commission rates. The only allegation is, or rather the purport of all the allegations is, that appellee's railroad is not a paying institution, and that the rates fixed by the Commissioners are lower than those charged by appellee —only this and the remarkable statement that appellee is charging much lower rates than those fixed by the Commissioners, for transporting freight and passengers over its line of railroad, "from points off the said line to points thereon, and from points thereon to points off the same, and from points off the same to points also off the same." This, of itself, is sufficient to dismiss the bill. It is apparent that all the "confiscation," "taking of the railroad company's property without compensation and without due process of law," etc., simmers down to a mere difference of opinion, as to proper rates, and proper proportions of local and through rates, between the railroad company and the Commissioners, wherein the court is asked to grant an injunction in favor of the railroad and against the Commissioners, its only information from the complainant being that Commission rates are lower than the railroad company's rates, and not even being informed what the latter are, as aforesaid. The Commission has never had the task imposed upon it of making all the railroads under its supervision pay. The theory of the appellee is that it may fix its rates at any figures, no matter how high, no matter how prohibitory they may be, and, if its road is not paying, the Commissioners cannot prescribe any lower rates. This is the whole theory of the bill, and if this theory cannot be maintained the bill fails: If the proposition is correct the

JUNE TERM, 1888. 427

Railroad Commissioners v. P. & A. R. R. Co.—Argument of Counsel.

Commissioners have jurisdiction, according to report, over very few railroads in Florida. But, in fact, many other considerations enter into the determination of what are just and reasonable rates—the rights of the public, value of the services to the patrons of the road, what the traffic will bear, the relative cost and risk in transporting various articles, what other railroads charge for like services, what this railroad charges for through freight and passengers, and many other considerations, enter into the question of reasonable rates, as well as the matter of making the road pay—perhaps no rates, no matter how high or unreasonable, will make it pay. 4 Woods, 452.

Many of the cases above cited were on bill and demurrer, on application for injunction, where the bills were full of allegations of irreparable injury, bankruptcy and ruin. In the Tilley case the allegation was that the railroad company would " not only be unable to establish a sinking fund to pay off its first mortgage bonds, but would be unable to declare dividends of any amount whatever to its stockholders, and the company would be driven into ruin and bankruptcy." 4 Woods, 435.

In Peik vs. Chicago, &c., Ry. Co., 94 U. S., 165-6, in addition to allegations of inability under the rates to pay interest, expenses, &c., it was alleged " that it is practically impossible to carry on " certain classes of its business. In Chicago, &c., R. R. Co. vs. Ackley; 94 U. S., 179, it was shown that the rate charged by the company was reasonable, but the court would not consider such showing against the legislative rate. So in other cases cited. The allegations of the bill, apart from the grounds of demurrer heretofore considered, are, therefore, insufficient to entitle the complainant to any relief.

IV. The attention of the court is called to the affidavit of the Commissioners and the exhibits attached, by which

is shown the conduct of the Commissioners and of the appellee in the establishment of the Commission rates, the motives and reasons of and for the actions of the Commissioners therein, and the fairness and good faith of the Commissioners in exercising their power and discretion in the premises.

*W. A. Blount* for Appellee.

The case made by the bill is, briefly, this: The Pensacola & Atlantic R. R. Co. was chartered by the Legislature of Florida, March 4th, 1881, as a corporation, with power to build a railroad, and to exercise in connection therewith the powers usually incident to such a corporation. It invested over $3,000,000 in its line of road, which it completed in 1883, and immediately began its business as common carrier thereon. It fixed local freight rates, which being unremunerative, it changed in 1885, hoping thereby to increase its income, but the income from local freight decreased upon this reduction, and has not again increased. It fixed local passenger rates, but finding them unremunerative it increased them, and there ensued a corresponding increase of income from local passenger travel, which increase has been sustained. But the freight and passenger rates under which it has been and still is operating, and all other income from operation, have not sufficed and do not suffice to produce an income sufficient to pay operating expenses of the road. Rates for through freight traffic and passenger travel are fixed by the laws of competition, and in no wise affect the local rates, or the income derived from them. The Legislature of 1887 created the appellants a Board of Railroad Commission, which has fixed rates of local freight and passage for the railroad company, much below the rates in use upon its road, and if these rates are enforced the excess now existing of expenses of operation

over earnings by operation will be much increased. The country through which the road runs is sparsely settled, containing eight inhabitants to the square mile, and the railroad has reached the maximum limit of local freight and passenger traffic under existing circumstances. After an unsuccessful appeal to the Board of Revisers, provided by the act of 1887, the railroad company filed a bill for an injunction against the Commissioners. The bill prayed a perpetual injunction against the promulgation of these rates by the appellants and against the institution of suits by them to recover penalties prescribed by the act of 1887. The appellants demurred, the court overruled the demurrer and granted a temporary injunction, and this appeal was taken.

The questions arising from these facts and proceedings logically divide and sub-divide themselves thus:

1. Is the decision of the Commission as to what are reasonable rates for the railroad company subject to review by a judicial tribunal?

2. If so, does the bill present a case of unreasonableness in the rates as fixed?

3. If the general reasonableness of the rates fixed by the Commission cannot be inquired into judicially, can an inquiry be made as to whether such rates compel the railroad company to operate its line of road at a loss, and thus deprive it of its property without due process of law?

4. If so, does this bill demonstrate that such is the effect upon the railroad company of the rates fixed for it by the Commission?

5. If either of these inquiries can be made, is the Commission so identical with the State that this suit cannot be maintained because it is in effect a suit against the State?

I. Upon the question as to whether a court can review the

declaration of the Commission that the rates fixed by it
for the railroad company are reasonable, the issue is wheth-
er the schedule of rates fixed by the Commission are con-
clusive upon the courts when used as evidence therein.    If
conclusive, there can be no review.    If not conclusive, the
court can form and deliver its own judgment upon facts
presented to it, and this suit can be maintained if the facts
stated in the bill justify it.

These schedules have no such conclusive effect, because :

1.—The Legislature did not intend that they should
have.

2.—If the Legislature did so intend, its intention was
without its own power, because it thereby attempted to
confer judicial power upon the Commission.

3.—If the power attempted to be conferred was not ju-
dicial, it was legislative and could not be delegated.

1. This involves a construction of the statutes to ascer-
tain whether the Legislature designed to make the Com-
mission rates conclusive :

Since the Commission has no punitive power conferred
upon it, and can enfore its orders only through the courts,
the effect of its fixing rates must be gauged by the effect
of the schedules of those rates when introduced in evidence
in the courts.    This is made evident by the fact that the
only section dealing with the effect of those schedules is
the 6th, and that prescribes only their effect when attempt-
ed to be used as evidence.    The last paragraph of the sec-
tion prescribes the *form* of the evidence by permitting cer-
tified copies of the schedules prepared by the Commission
to be introduced.    This obviates the necessity of the testi-
mony of witnesses to the *fact* of the action of the Commis-
sion.    The first paragraph of the  section prescribes the
*effect* of the action of the Commission when that action has
been put in evidence before the court.    This obviates the

necessity of proof by the Commission of the *basis* of its action.   The purpose of both paragraphs is the same, *i. e.*, the facilitation of getting before the courts, with the least embarassment to the Commission, evidence of its action, and of the propriety of that action.   The section is wholly confined to dealing with the instruments of evidence.   The power to fix rates is given by the preceding (the 5th) section, and this section is confined to the disclosure in effective shape of those rates when fixed.   Bearing in mind then, that this section was not designed to establish the powers of the Commission or its relations to the railroad, but to prescribe rules for rendering its action effective upon a resort to the courts, the only question left is how effective was it intended to make it ?

The statute provides that the schedules made by the Commission, " shall in (any suit) brought against any such railroad corporations    *    *    *    be deemed and taken in all courts of this State as sufficient evidence that the rates fixed therein are just and reasonable rates    *    *    *."

While the argument appears narrow, yet it is patent that this provision has no application to a suit brought *by* a railroad company against the Commission, but is to suits brought against the railroads.   Whatever might have intended to be inserted, the limitation in that which is inserted is clear, and the court will have less hesitation in applying that limitation in a case when the application will relieve the railroad company from an exclusion from showing the truth.

But even if suits *by* railroads are intended, still the contention of the Commission is not correct.   That contention is that the Legislature intended to make the schedules conclusive evidence that the action of the Commission had been correct,—to place its action beyond question,—and to make it entirely autocratic.   The contention of the railroad

432 SUPREME COURT.

Railroad Commissioners v. P. & A. R. R. Co.—Argument of Counsel.

company is that the Legislature merely intended to relieve the Commission from proof in each instance of the reasonableness of its rates, and to put upon the corporation contesting that fact the burden of proof.

In deciding between these contentions we have but little assistance from the word " sufficient "—itself, for the purpose for which it is to be sufficient is not stated. The schedules might suffice for the purpose of proving the reasonableness in the absence of any counter-proof, or they might suffice in exclusion of all counter-proof. What aid, however, is afforded by the word is in favor of the railroad company. For, evidence may be sufficient, and yet not uncontrolable. The distinction between that evidence which would prove an issue and that against which no other evidence is admissible does not admit of doubt.

Nor do we get much help from the journals of the Legislature, for we find that the Senate (Journal of 1887, p. 530,) declined to say that it meant either *prima facie* or conclusive. We must then in large part resort to considerations outside of the word itself.

The considerations which, we submit, should determine the contention in favor of the railroad company are:

That while the Senate did not define the word as meaning *prima facie*, it emphatically declined to endorse the idea that the evidence should be conclusive. If not conclusive, then the railroad company has a standing in court to show the unreasonableness of the schedule fixed.

That the mandate of the Constitution is that the Legislature shall have power to prevent *excessive* charges, (Art. XVI, Sec. 30,) and it is not to be presumed, even if it had the power under this constitutional provision, (C. & A. R. Co. vs. People, 67 Ill., 23,) that it would authorize its subordinate, the Commission, to prevent charges not excessive,

and to fix rates itself below those which are in fact reasonable and just.

That the Legislature itself (in the 5th section) has commanded the Commission to fix *just and reasonable rates*, and has given it no license to fix rates at its discretion, whether just or unjust, reasonable or unreasonable. And yet this license would be necessarily implied if there could be no attack upon the rates fixed by them.

That, if there is any doubt, it must be solved against the attempted exercise of a power to prevent a hearing and determination of one's rights in a judicial proceeding. The existence of this power will be discussed hereafter, but whether it exists or not, the leaning of the court will be against a construction which declares that it has been exercised and that there has been a conclusive declaration that a fact exists when in truth it does not exist.

The argument *ab inconveienti* used by the Attorney-General will not avail. If the rates fixed by the Commission are in fact reasonable, attacks upon them by the railroad company will be infrequent, and if frequent will be unavailing. If the rates are unreasonable, it must be presumed that the Legislature did not intend to have them remain a standing infliction, but intended the corporations affected by them to have an opportunity for relief against them.

2. I do not doubt the power of the Legislature to create a Commission with power to make schedules which shall be *prima facie* evidence of reasonableness of rates fixed by it, but it cannot make them conclusive, because a conclusive declaration of facts in matters of private rights can be made only by the courts. In the determination conclusively of the reasonableness of the rates of the railroad company the Commission would exercise judicial powers which

434 SUPREME COURT.

Railroad Commissioners. v P. & A. R. R. Co.—Argument of Counsel.

are prohibited to it by Article II, and sections 1 and 35, Article V, of the Constitution of Florida. These respectively provide as follows:

"Art. II. The powers of the government of the State of Florida shall be divided into three departments—Legislative, Executive and Judicial ; and no person properly belonging to one of the departments shall exercise any of the powers appertaining to either of the others, except in cases expressly provided for by this Constitution."

"Sec. 1, Art. V. The Judicial powers of the State shall be vested in a Supreme Court, Circuit Court, Criminal Courts, County Courts, County Judges and Justices of the Peace."

"Sec. 35, Art. V. No courts other than those herein specified shall be established in this State."

These articles and sections clearly prohibit the exercise of judicial powers by this Commission. And the fixing of legal rates is a judicial function, depending upon questions of difference between the railroad company and its patrons —in this case upon the determination of definite and distinct claims of individuals, who complain of ill treatment at the hands of the railroad company. As to whether they or the railroad company are correct, is a question of private right. If the rates fixed are reasonable, the former are correct ; if they are unreasonable, the latter is correct. The decision upon their respective rights after a consideration of their respective claims, upon the evidence introduced by them respectively, is the result of the exercise of judicial powers. Accordingly, a vast majority of the courts hold that the question of reasonableness is a judicial question. 61 Mo., 64 ; 4 Houst., 506 ; 23 O. S., 168 ; Coke, 2 Int., 222 ; Bacon's Ab., *sub tit.* Toll ; Comyn's Dig., *sub tit.* Toll ; 6 M. & S., 70.

Our contention as to this point is not concluded by the Granger cases (94 U. S.) in which it is declared that the question of reasonableness is for the courts, unless the Legislature has acted upon it. Even if this be true in its greatest breadth, yet here the Legislature has not acted, but created an executive body and devolved upon it this judicial power. Admitting that the Legislature in its alleged sovereign control of the rates to be fixed by a corporation can determine absolutely the reasonableness of such rates, still that power must be a legislative power, and though exercisable by it, is not exercisable by its creature, which does not possess legislative powers. If it does not itself choose to act directly, it has not invoked its prerogative, and if it desires that some other function of the government shall do its duty, such other function can do it only if allowed by constitutional limitations, and if the nature of the act to be performed is prohibited to that function, then it cannot be performed by it. In this case, the acts to be performed are (if not performed by the Legislature) judicial, and the Commission cannot exercise judicial functions.

The Commission Cases, 116 U. S., does not operate against this, for the judicial power involved in passing conclusively upon a question was not given to the Commission by the Act of Mississippi, but their decision was expressly made subject to review by the Courts.

3. But if the Court be of opinion that the exercise of this power does not involve the exercise of judicial power, then we insist that it involves Legislative power.

Conceding that the Legislature itself possesses the power sought to be exercised by the Commission, yet it possesses it in its sovereign capacity as representative of the people. The people delegates the power to the hundred or more members of the Legislature, assisted by the Governor. It

did not confide it to any number of men greater or less, or
other than those. Its own rights are to be protected by
its delegates, and it insists that those rights shall be passed
upon only by a legal quorum of those delegates.

The railroad company, too, took its rights subject to
legislative or judicial control, but not the control of three
men nominated by the Governor. Such subjection is the
substitution of the discretion of the appointees of one branch
of the law-making power, for the united judgment of the
two branches, and this substitution is made in defiance of
the constitutional mandate that legislative functions shall
be exercised only by the Legislature. Art. IV, Constitution
of Florida.

II. No argument can add to the force of the statement
of the bill showing the utter unreasonableness of the rates
fixed by the Commission, and I refrain from a discussion
here, directing the attention of the court, however, to the
treatment of the kindred question under the fourth sub-
division of this brief.

III. Even if, however, the court decides that the Com-
mission may, without subjection to review by the courts,
determine the reasonableness of the railroad company's
charges, and fix rates which it deems reasonable, can the
rates fixed by it be so low as to deprive the corporation of
the power to earn any income from the use of its property,
that is, to compel a subjection of its property to public use
without compensation? We submit that the enforcement
of such rates is the taking " of property without due pro-
cess of law," and, therefore, violative of section 12, Bill
of Rights of the Constitution of the State of Florida, and
of section 1, Art. XIV, of the Constitution of the United
States.

The discussion of this question involves the discussion of
two subordinate ones:

1. Is the right in the railroad company to use its tangible property so as to make it beneficial and productive, property itself?

2. If so, is it protected by the Constitutional provisions cited?

1.—The Pensacola & Atlantic Railroad Company is by the first section of the charter given the power to "have, hold and enjoy the franchises, rights and privileges hereinafter provided, and shall be capable in law to purchase, hold and enjoy such real and personal property as may be necessary and proper for the uses and purposes of said company." By the second section it is authorized to build a line of railroad. By the seventh section it is given the "rights, powers, privileges and liabilities usual and necessary to such a corporation."

The bill alleges the construction and equipment of the line of road, so that there is before the courts the fact of the acquisition of the property authorized by the charter, and, therefore, of the vesting of property which is protected by the constitutional limitations cited. But it is insisted that while the *corpus* itself is protected, the beneficial use is not protected, the equivalent of which proposition is that the State may not without compensation subtract one ounce from the bulk of a citizen's property, but may render it worthless by a compulsory deprivation of its use. We expressly ignore in this case any contract rights which the railway company may have under its charter, and we place ourselves firmly upon the position that the company has lawfully acquired property fitted only for a special use, and that the acquisition of it has vested in it a right to hold and to use it beneficially, against any enforced deprivation of it or its use, except a deprivation resulting from debt or crime or a forfeiture of its franchise by its own wrong-doing.

438 SUPREME COURT.

Railroad Commissioners v. P. & A. R. R. Co.—Argument of Counsel.

It would seem useless to attempt to add by argument or illustration to the force of the statement of the proposition, but the Attorney-General seems so earnest in combatting it, that the Court will pardon me.

The use for the purpose of making a profit from such use constitutes the sole value of ninety-nine per centum of property owned by men. So long as one man cannot own all property and carry on all occupations necessary for the satisfaction of his needs and desires, so long must he pay compensation to the owners of property and plyers of occupations for his use of it and them. And such receipt of compensation constitutes the value to them of the property owned and the skill and energy bestowed. Some small property contributes to the personal needs and sentiments of the owners, but the amount is infinitesimal when compared with that which is used by others than the owner. If there can be a prohibition by the State of the renting or hiring to, or use of property by, another, for a remuneration to be paid by that other, then we are relegated to barbarism where each confines himself to the gratification of his own personal needs. To hold that there is a vested right of property protected by the Constitution in the *corpus*, and not in the use, and profits from the use, is to say to the farmer, that he may own land and pasture his own stock, but that he may be deprived of the right to depasture the stock of others thereon. The hack of the hackman may not be taken from him, but he may be forbidden to use it in his trade. The freeholder may build and retain a house, but the Legislature may forbid him to rent it, &c., &c. The illustrations arise so easily and are so conclusive that it is not worth while to multiply them.

But we are not left for our dependence upon my own argument, for we find the decisions of the courts and the

utterances of learned judges in strict accord with this view.

Judge Field says (Munn vs. Illinois, 96 U. S.): "There is indeed no protection of any value under the constitutional provisions which does not extend to the use and income of the property as well as to its title and possession." And again: "If, for instance, the owner is prohibited from using his building for the purposes for which it was designed, it is of little consequence that he is permitted to retain the title and possession, or if he is compelled to take as compensation for its use less than the expenses to which he is subjected by its ownership, he is for all practical purposes deprived of his property as effectually as if the Legislature had ordered his forcible dispossession."

Chief Justice Taney says in Bronson vs. Kinzie, 1 How. 311: "It would be unjust to the memory of the distinguished men who framed it [the Constitution of the United States] to suppose that it was designed to protect a mere barren and abstract right without any practical operation upon the business of life."

The Supreme Court of Mississippi says (R. R. Commission vs. Yazoo, &c., R. R. Co., 62 Miss., 607,): "The State (Mississippi) * * * may create corporations * * * but * * when they are not a part of the machinery of government, the franchises cannot be resumed by the Legislature or its *benefits be essentially impaired*, without the consent of the grantee."

Thos. M. Cooley, speaking for the court, declares: "There is no well considered case in which it has been held that the Legislature [even] under the power to amend a charter, might take from the corporations any of its substantial property or *property rights*." Detroit vs. Plank Road Co., 43 Mich., 146.

To the same effect is Com. vs. Essex Co., 13 Gray, 239 ; R. R. Co. vs. Maine, 96 U. S., 499.

See Boyle vs. Phila., &c., R. R. Co., 54 Penn. St., 310, in which the court says: "A corporation authorized to engage in a business, as a neeessary incident to its authority, has the right ordinarily belonging to such business, and compensation for services is inseparable from the right."

And the Supreme Court of the United States says (Pumpelly vs. Green Bay Co., 13 Wall., 177,): "It would be a very curious and unsatisfactory result, if, in construing a provision of constitutional law, always understood to have been adopetd for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen and commentators, as placing the just principles of common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that, if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to destruction without making any compensation, because, in the narrowest sense of the word, it is not taken for the public use. Such a construction would pervert the constitutional provision into a restriction on the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right, under the pretext of the public good, which had no warrant in the laws or practices of our ancestors."

In Needles vs. Chicago, &c., 113 U. S., 580, it is declared, "Equally implied, in our judgment, is the condition that the corporation shall be subject to such reasonable regulations, in respect to the general conduct of its affairs, as the Legislature may, from time to time prescribe, *which do not*

*materially interfere with or obstruct the substantial enjoyment of the privileges the State has granted, and serve only to secure the ends for which the corporation was created."*

And in Stone vs. Farmer's Loan, &c., 116, U. S., 381, it is said : " From what has thus been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretence of regulating fares and freights, the State cannot require a railroad corporation to carry persons or property without reward ; neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law."

2. The discussion as to whether the use of property is property itself, has inevitably led to a citation of authorities holding that such use is protected by the Constitution. In order to maintain the contrary position, absolute power over corporations and their property must exist in the Legislature. At this day, however, no court so decides and no learned lawyer so contends. Any power possessed by legislation over corporations, which is not reserved in their charters, exists only because of relations, in certain instances, between corporations and the public, which necessitate the interference by the State as the representative of the public for the protection of that public. This power is a power conferred upon the *Legislature* by the *corporation*. So long as the corporation chooses to confine itself to private business, the Legislature has no such power, but when the corporation holds itself out to the public as ready to take tolls from the public indiscriminately, it then brings itself into such a relation with the public thatthe public has a right to regulate, to a certain extent, the tolls which it

shall pay, and it may exercise such right, either through the courts or through its servants, the Legislature. But this right to regulate has its limits, and that limit is found in the reason of the existence of the right. The right has no other foundation than in the maxim, " *Sic utere tuo*," *&c.*—(94 U. S., 120,) and the application thereto of the police power of the State for its enforcement. The right of the public is to be carried at a reasonable rate. If the corporation charges an unreasonable rate it thereby abuses its monopoly so as to ignore the public, and the public has a right to see that the monopoly shall not be so used. This is the source and this is the limit of the power. The public has no concern in the rates charged, except to see that they are not so high as to be a violation of their rights, that is, to be extortionate, and it has a right to repress and reduce such rates till they cease to be extortionate. When they so cease they become reasonable, and the limit of the power of the public is reached, because the necessity for its protection has ceased. When it attempts to exert a power further than this it transcends its authority and trenches upon the constitutional rights of the corporation.

The Attorney-General opposes to this reason and authority the Granger cases: Munn vs. Illinois, 94 U. S., 113 ; Chicago, &c., R. R. Co. vs. Iowa, ib., 155 ; Peik vs. Chicago, &c., ib., 164 ; Chicago, &c., vs. Ackley, ib., 179 ; Winona, &c., vs. Blake, ib., 180, and the cases of Tilley vs. S. F. & W. R. R. Co., 4 Woods ; Ga. R. R. Co. vs. Smith, 70 Geo.

The cases in 70 Ga. and 4 Woods are absolutely useless upon this question, because they were both decided upon consideration of the Georgia Code, which give full and arbitrary control to the Legislature over corporations ; and in the latter case there was an additional special control,

JUNE TERM, 1888. 443

Railroad Commissioners v. P. & A. R. R. Co.—Argument of Counsel.

even to the extent of withdrawing the charter given by the act under which the Savannah, Florida and Western operated.

The Supreme Court of the United States, in the Granger cases, (94 U. S.,) declared that the Legislature had a right to regulate tolls charged by public servants, and that it had a right to fix the maximum rate of such charges. It will be noticed, however, that the right to fix a maximum rate which would be detrimental to the vitality of the corporation was before the court only abstractly. The Legislature had fixed certain rates, and the contention of the appellants was that the Legislature had no right to fix rates at all, because that was a judicial question. Wabash, &c., vs. Illinois, 118 U. S., 595. The right to fix rates below a living rate was not discussed, except argumentatively, and not decided except so far as it may be considered as decided from the broad generality of the language. It was not decided distinctly, because no such point was before the court. And even in the case of Munn vs. Illinois, it is admitted that the power of the Legislature in regulating rates is not absolute, but may be controlled by the 14th Amendment if the regulation of the use amounts to a deprivation of property. 94 U. S., 125. The language is this: "From this it is apparent that, down to the time of the adoption of the 14th Amendment, it was not supposed that statutes regulating the use, or even the price of the use, of private property necessarily deprived an owner of his property without due process of law. Under some circumstances they may, but not under all. The Amendment does not change the law in this particular; it simply prevents the State from doing that which will operate as such a deprivation." And that it was not intended to be so decided is shown by the subsequent cases of Shields vs. Ohio, 95 U. S., 319; Chicago Life Ins. Co. vs. Needles, 113 U. S., 580;

Stone vs. Farmers' Loan, &c., Co., 116 U. S., 381., in which the court admits that the power of the Legislature is not unlimited, but that it has that very limit for which we contend here.

In this latter case the court still adheres to its announcement as to the right of Legislatures to regulate the rates of railroad companies, so as to keep them within reasonable bounds, but admits that there is a limitation upon the power of Legislatures in this respect, and that it must stop short of compelling a railroad company to work and use its property without reward ; short of a deprivation of the value or use of property. These, it is true, are abstract enunciations, but they stand opposed to the abstract enunciations in the Granger cases, which were not in anywise necessary to the decisions of the cases then before the court, because, as I have heretofore shown, there was not in these cases any attempt on the part of the Legislature to reduce the rates to a point where they would be absolutely unremunerative.

This case also enforces the position heretofore taken by me, that this question of reasonableness is for the courts. For, if the power of the Legislature is limited by the Constitution, who is to see that that limit is not transgressed ? Surely not the Legislature itself, for it can scarcely be contended that it is to construe the Constitution when it touches its rights, and apply that construction. That would make the Legislature paramount to the Constitution. Just as surely the courts must apply the limitation here, as they must in all other cases where the Legislature attempts to exceed its powers.

IV. The only remaining question upon the merits is whether the bill in this case shows that the railroad company is compelled to use its property without reward therefor, and is thereby deprived of that property without due

process of law. Reference to the bill readily shows that fact. The allegations are that not only is no interest made upon the money invested, but that the earnings from the operation of the road are less than the expenses of such operation, that is, that the service rendered to the public in the carriage of freight and persons is performed, not only without compensation to the railroad company, but at a loss to it.

No addition by argument can be needed to show that if this loss be compelled by the State, or if it be increased by the State's compulsion, then the State has deprived the railroad company of its property without due process of law.

The Commission, however, insists that the fact that a loss results from the present rates does not necessarily imply that a loss will result from a decrease of rates, but that on the contrary such decrease of rates may result in increased traffic and travel, and thus in increased income, and that as the affirmative lies with the railroad company to establish that the Commission rates will necessarily result in a loss, it fails in thus demonstrating, because there is a *possibility* that there may not be a loss. The position is equivalent to an assertion that no showing by the railroad company can be strong enough until it has allowed the State to experiment with it under reduced rates, and the experiment has shown that a reduction in rates means a reduction in increase.

We admit the possibility, simply because all things are possible. It is possible that immediately upon the reduction of rates, 100,000 persons might settle in West Florida, and thus produce the result of so increasing the business of the railroad company as to make the reduction of rates innocuous to it. It is possible that the whole cotton trade of

Georgia might be directed to Pensacola, or the iron trade of Alabama to Jacksonville, over the P. & A. R. R., thus increasing the income from through traffic so that the loss on local traffic might be counterbalanced. But while possible, these things are only remotely so, and courts cannot deal with large monied interests of its citizens upon a consideration of almost impossible contingencies.

The railroad company shows a present existing state of facts as opposed to these possibilities. A sparsely populated country with only eight inhabitants to the square mile; a single industry, the shipment of lumber, for the transportation of which nature with its streams enters into competition with the railroad; an entire absence of cities, and an almost entire absence of towns along its line, producing a want of local intercommunication of freight and passengers; present a concurrence of physical features which would seem to demonstrate beyond cavil the want of materials from which a reduced rate should produce an increased income. In determining judicially human rights, no facts can be taken into consideration except those which exist or those which will certainly exist. Here we show those which exist, and the law presumes that they will continue to exist. On the other hand, the Commission asks that flagrant facts be ignored and that the court assume that a cause yet to be applied will produce a result which is entirely problematical. The conditions which we insist will produce a given result now exist; but the conditions upon which the result sought to be assumed by the Commission would be had, have to be created. The present inability of the country, through which the line of road passes, to furnish greater traffic for the road is shown by the bill; the future ability must be shown by the Commission. It is patent that a decrease of rates must result in a decrease of income, unless there is an increase of business in an inverse ratio to the de-

crease of rates. The decrease of rates has been made ; the increase of business is entirely conjectural and depends wholly upon an entire change of existing conditions. Even if it be conceded that some change would take place, it by no means follows that such change would be inversely commensurate with the loss from the change of rates.

Necessarily from the facts which the bill presents, the decrease of rates will result in a present loss to the railroad company, and in a future loss for at least a short space of time. If this be true, then there is a present deprivation of the right to make the use of property pay for the expense of its use, and a present deprivation of property without due process of law. Now, if the Commission attempts to justify this present deprivation by the plea that there may be a future increase, and a future want of deprivation, does it not lie upon the Commission to prove its justification ? When the railroad company shows that under existing conditions its constitutional rights will be violated, and the Commission claims that under changed conditions there will be no violation, does it not lie upon the Commission to show beyond question that such change will take place ?

The bill, however, closes all opportunity for a claim that experimentation might result in an increase of income, for it shows that such experimentation has been had and that the contrary result has been produced. A decrease of rates has resulted in a decrease of income, and conversely an increase of rates has resulted in an increase of income. The deduction is inevitable. When the conditions producing traffic, which constitute one factor of the amount of income, are constant, and the rates which constitute the other factor, have also been constant, the income itself has been constant. But a decrease of rate has produced a cor-

responding decrease of income, and an increase of rate has produced a corresponding increase of income, so that the conclusion is irresistible that the traffic has remained uniform, and that the country from which the traffic comes has not responded to or been affected by the changes of rates. If it has not in the past, why should it in the future, the conditions remaining the same, as they are shown by the bill to remain?

But, even if it should appear that in the future the present rates fixed by the Commission may be remunerative to the railroad company, how near or how far is that future? And how great will the loss be while the experiment is being tried? Constitutional provisions protect small affairs as well as large ones, and if, by a direct compulsion by the Commission for a month, the operation of the railroad is carried on for that time at a loss, is not it deprived of its property, as much as if the experiment were continued for a year or a decade? The State has no more right to compel the loss of ten thousand dollars than it has of a million. And who is to judge of the length of time required for the experiment? Countries are not populated and dotted with industries in a year, and if progress should be made in that time, would not the petition for further time for the experiment be as potent then as now? And in the meantime what power would afford reparation to the railroad company which had been compelled to furnish the use of its property to the public free? These questions can have but one answer.

But, falling back to the rear trenches, the Commission says that for the railroad company to bring itself within the benefit of the language of Stone vs. Farmers' Loan and Trust Company, it must appear that the action of the Commission in reducing rates was a mere pretense of a *bona*

## JUNE TERM, 1888. 44⑨

Railroad Commissioners v. P. & A. R. R. Co.—Argument of Counsel.

*fide* exercise of judgment, covering a positive design to injure the railroad company by a deprivation of its property.

This argument is evidently unsound. The right of the complainant to be protected in the reasonable use of its property cannot depend upon the good faith or the pure motives of the Commissioners. The deprivation of property and its actual confiscation would not be affected by the motive with which the rates were fixed by the Commissioners, but would depend entirely upon the result of those rates. No matter how pure minded the Commissioners, or how honest in their opinion, if their acts deprive the complainant of its constitutional rights, those acts must be enjoined.

It is insisted, however, that original reasoning upon this question is shut out, because the Supreme Court of the United States in the cases of Peik vs. Chicago, &c., Ry. Co., 94 U. S., 165; Chicago, &c., Ry. Co. vs. Ackley, 94 U. S., 179, and the Court in Tilley vs. S. F. & W. R. R. Co., 4 Woods, decided against the railroads upon much stronger showing as to the deprivation of property than is made here. I dismiss the contentions by inviting the court's attention to the statement of facts in those cases, from which it will appear that in each case protection was asked, not only in its right to earn more than its bare expenses, but to earn enough to pay interest upon its investment and *interest upon its bonds.* In the Peik case the suit was by bondholders who were interested only in the payment of interest on the bonds. A reasonable use of the property would not by any means necessarily embrace the latter, as no Constitutional provision protects property impressed with a relation to the public to such an extent as to compel such freedom in its use as not only to earn a

450 SUPREME COURT.

Railroad Commissioners v. P. & A. R. R. Co.—Argument of Counsel.

compensation for the use, but also to pay the debts of its owners.

No such question is presented here. The only declaration necessary to sustain the court below, is that the Legislature has no power to compel the railroad company to work for less than is necessary to pay its operating expenses. We ask the court to declare this. And we ask it further to declare, for the settlement of the principle, that the State cannot prohibit the earning, over and above expenses, of a reasonable compensation, determinable by a consideration of current rates of interest for sums of equal magnitude.

V. We come to the last inquiry as to whether the Commission is so identified with the State that this action cannot be maintained. Logically this inquiry would precede all others, but since its determination depends upon the relief asked by the railroad company, and the basis of that relief, I have postponed its consideration until after a discussion of the merits.

The basis of our relief is that the Commission has fixed rates at which the railroad company cannot pay expenses of operation, and that it is endeavoring to enforce these rates by a promulgation of them, and by suits for penalties alleged to have been incurred by a violation of them, and that it has thereby induced and induces various persons to bring suits against the railroad company for such alleged violation.

The railroad company insists that:

1. Such action is outside of the law creating the Commission.

2. If the law authorizes the action, then the law itself is outside of the Constitution, as permitting the taking of property without due process of law.

JUNE TERM, 1888. 451

Railroad Commissioners v. P. & A. R. R. Co.—Argument of Counsel.

Upon this the relief asked is that the Commission be enjoined :

1. From instituting further suits ; and,

2. From the promulgation of its schedules as binding upon the railroad company.

The Attorney-General, relying upon the case of *ex parte* Ayers, 123 U. S., insists that the relief asked is against the State itself, and that the suit cannot therefore be maintained.

He draws from that decision the following propositions :

1. That an injunction cannot be maintained against the officers of a State to restrain them from instituting suits in the name of the State.

2. That it cannot be maintained unless the officer has made himself a trespasser, and thus rendered himself liable to an action.

3. That it cannot be maintained if the act to be enjoined involves the exercise of discretion.

We think and submit that these negative propositions were not decided in the case under discussion, and have never been been decided in the United States Supreme Court.

There is much language in the Ayers' case looking towards the propositions of the Attorney-General, but there is no such decision in the case. The only thing decided upon this point was that when the object of the injunction is to compel the performance of a *contract* by the State it is a suit against the State and not maintainable. This was the case before the court, and it confined itself in its decision to that case, as will be seen by its language on pages 491, 502, 503 and 504 *passim*, and especially on page 503, where the distinction between the protection afforded by the 11th amendment to contract rights and to other rights

of persons and property is clearly pointed out. The inference is irresistible that State officers cannot be enjoined on the ground that the acts constitute a breach of a contract with the State, but they can be enjoined upon the ground that their acts constitute an infringement upon constitutional provisions other than that prohobiting the impairment of the obligations of contracts. The reason of the distinction is obvious. There is no greater sanctity thrown by the Constitution of the United States over rights protected by section 10, Article I, than over other rights also protected by it. But from the very nature of a right arising out of a contract with the State, there can be no remedy upon it or against its violation without the presence in the litigation of the other contracting party. The contract rights of the State cannot be determined in a suit to which it is not a party. But where there are no contract rights, but an officer attempts to shield himself under a direction or mandate of the State that mandate must be shown to be law. A mandate to an officer by the State does not constitute any identity between the State and that officer, and if the mandate be unlawful and the execution of it operate to the injury of the citizen he may restrain the execution.

I think that the court will find that the Supreme Court of the United States, whatever may be its general language, has never refused to recognize the right of judicial cognizance over State officials upon the ground that the State was being sued except in cases where a contract of the State was sought to be enforced.

Such are the cases of Louisiana vs. Jumel, 107 U. S., 711; Antoni vs. Greenhow, 107 U. S., 769; Cunningham vs. Macon, &c., 109 U. S., 446; Hagood vs. Suthern, 117 U. S., 52; *in re* Ayers, 123 U. S., 443.

Which are all the leading cases in which I find that jurisdiction was ever denied.

If then the courts refuse jurisdiction of injunction suits against State officials only when the object sought is the enforcement of a contract of the State, then they will not refuse when the wrong complained of is that property is being taken without due process of law. Such is our position here and the suit is maintainable.

If, however, our above analysis has not found the true *ratio decidendi* of those decisions, yet this suit is still maintainable. We insisted in the beginning of this brief that the Legislature did not intend to give any power to the Commission to proceed to the lengths to which it has proceeded. If this be so then their acts are not only without constitutional, but also without legislative authority, and it could in no sense be said to represent the State or to be the State. Its acts would be wholly without color of authority and void, and the point as to whether enjoining them is enjoining the State could not arise.

But if none of our foregoing contentions are true, yet it does not follow that our suit against the Commissioners will not lie.

1. Even though suits by the State will not be enjoined, we submit that the rule would apply only to suits directed by the State to be brought, or suits brought for claims made by or due to the State. But the suits here sought to be enjoined are not of either of these. The creation of a state of facts making it the duty of the Commission to bring suits lies entirely with the Commission. Now if the Commission fixes an unlawful rate, and the railroad company refuses to abide by it, and the Commission brings suit for the violation, can it in any sense be said to be a suit by the State?

The suit does not begin with the State. It is not founded upon any claim or exigency of the State, but is

brought to punish disobedience to unlawful exactions of the Commission.

The State has not directed the making of rates which impair constitutional rights of the railroad company, but the Commission makes such rates, and then sues for a violation. Clearly such suit arises out of no claim made by the State, but is based entirely in the wrong of the Commission, and can be enjoined without interfering with the rights of the State to bring suits in its own courts.

2. But if the court declines to adopt this view and follows the dicta of the United States Supreme Court that this suit cannot be maintained unless the Commission has trespassed upon the property or rights of the railroad, still one phase of the bill meets this, and the suit is maintainable. The bill alleges the promulgation of the schedules as obligatory upon the railroad, and the inducement by the promulgation to sue the railroad company, which inducement had been seized by many and is about to be seized by others. This action is in direct violation of the personal and property rights of the railroad company, which is what is said *in re* Ayers to constitute a personal liability on the official sufficient to furnish the foundation for an injunction. The language of the court is that there must be a "charge against them in their individual character" for something "done or threatened which constitutes, in contemplation of law, a violation of personal or property rights, or a breach of contract to which they are parties."—p. 497. And there must be a "threat of violation of the *personal* or *property* rights of the complainant for which they are personally and individually liable."—p. 500. And there must be a "personal act of the individual defendant," constituting "a violation of right for which the plaintiff was entitled to a remedy *at law* or *in equity* against the wrong doer in his individual character."

I might suggest with great force (to my own mind) that a cause of action by which an individual should procure even the State to bring, and to threaten to continue to bring, numerous vexatious suits without constitutional basis, would be a wrong to private rights which would render the perpetrator liable to an action for damages and make a basis for an injunction. But I pass this, as possibly covered by the decision *in re* Ayers. But when the same course of conduct publishes to the world that the railroad company is violating the law of the State, is making excessive and illegal charges, and is rendering itself liable to suits and punishment for the violation, and the actual result is not only to render the railroad company subject to suits for exemplary damages and its employees subject to arrest and imprisonment for assaults upon persons ejected for refusing to pay its rates of fare, but in fact numerous such suits have actually been brought, and some have ripened into judgment, can there be a doubt that personal actions would lie against the violators of the railroad company's right to security and peace in the enjoyment of its property?

Such an action would certainly lie for this slander of the corporation in its business. 3 Bing., 104; Harris vs. Burley, 8 N. H., 216 ; Phillips vs. Hoefer, 1 Penn., St., 62.

And they could enter no objection except by showing the charge of illegality and extortion to be true. Const. Sec. 13, Bill of Rights.

But, if no action for damage would lie, an injunction would against the individuals of the Commission, to prevent repetitions of the injuries by them, and in such injunction proceedings the question of malice would not arise, for the sole inquiry would be whether the charges of violations were or were not true, whether if not true they produced damage to the railroad company, and whether

the damage was of such character by reason of continuance, repetition, or other sources of irreparable damage, as to make equitable interference proper. Quartz Hill, &c., Co. vs. Beal, L. R. 20 Ch. Div. 501, 507; Thomas vs. Williams, L. R. 14 Ch. Div. 864, 871, 872; Thorley's Cattle Food Co. vs. Massam, L. R. 14 Ch. Div. 763.

3. The last contention of the Attorney-General is that this is an attempt to enjoin the exercise of discretionary power of the Commission, and therefore is a suit against the State and not maintainable.

Whether it is or is not a suit against the State, if the suit is one to compel the exercise of a discretionary power, so as to produce a desired given result, then we admit of course that the bill should fail. But the whole gist of the railroad company's case is that the Commission has no discretion which authorizes them to fix rates in the manner fixed in this case. We admit that if the act of the Legislature gives it such scope, its discretion is absolute between the nether limit of a living interest upon the investment and the upper limit of attainable profit, but it cannot go below the nether limit, for then it trenches upon constitutional rights. When there is no power, there can be no discretion, and the Commission reaches the limit of its power when in its downward course of reduction it reaches the point when a further descent would deprive the railroad company of a just compensation for the use of its property.

THE CHIEF-JUSTICE delivered the opinion of the court:

Appellants are Commissioners under an act of the Legislature of Florida of 1887, " to provide for the regulation of railroad freight and passenger tariffs in this State; to prevent unjust discrimination in the rates charged for transportation of passengers and freights, and to prohibit

railroad companies, corporations and. lessees in this State from charging other than just and reasonable rates, and to punish the same and prescribe a mode of procedure and rules of evidence in relation thereto, and to appoint Commissioners and to prescribe their powers and duties in relation to the same." They bring this case here for a reversal of the decree overruling their demurrer to the bill of the Pensacola and Atlantic Railroad Company against them, which also enjoins them from "promulgating as binding upon the complainant the rates for transportation of freight and passengers heretofore prescribed by the defendants for the complainant, or other rates substantially the same as said rates, and from procuring or permitting the institution of any suits against the complainant for any alleged charges by the complainant in excess of the said rates heretofore fixed, or in excess of any other rates which may be fixed by the defendants for the complainant substantially the same as the said rates."

The gravamen of the bill is, that the Pensacola and Atlantic Railroad Company is a corporation of the State of Florida, empowered to construct and operate a railroad from some point on the Apalachicola river to the city of Pensacola; that the road was completed and began to operate in April, 1883, and has been operated ever since; that the defendants were appointed Commissioners under the act above mentioned; that they have fixed rates for freight and passenger transportation on the railroads of the State, including that of complainant, which they have determined to be just and reasonable charges to be made by said railroads, and have ordered the several companies, including complainant, not to make any charges greater than the rates so fixed; that they have fixed three cents per mile as the uniform rate to be charged by complainant for passengers, and have fixed rates for freight varying

458                    SUPREME COURT.

Railroad Commissioners v. P. & A. R. R. Co.—Opinion of Court.

with the distance of transportation, and with certain classification of the various kinds of freight, which they have arbitrarily adopted; that the rates thus fixed were made in spite of facts hereinafter stated and argument thereon before defendants; and as authorized by the act, complainant protested to defendants against the enforcement of said rates, but the defendants refused to change the same, and thereupon complainant appealed to the Board of Revisers provided by the act, but that board confirmed the action of defendants; that complainant, for reasons hereinafter stated, declined to adopt the rates thus prescribed, and have charged for passengers and freight more than said rates, but the rates so charged were just and reasonable, and in no instance has it made a charge that was not just and reasonable, never having charged for passengers more than five cents per mile, the rate authorized by its charter; that consequent upon such charges by complainant, which defendants allege to be in violation of the act and of their order, they demanded that complainant restore to the persons so charged the excess over the rates fixed by them; and upon complainant's refusal they have procured the Attorney-General of the State to bring several suits (naming them) to recover the penalties prescribed by the act for charges in excess of rates so fixed; that numerous persons who have been charged by complainant more than the rates fixed by defendants, relying on the authority of defendants to fix rates, have brought suits against complainant to recover damages for said alleged excessive charges; that said suits of the State and of the said persons are now pending, and the defendants announce their intention to procure other suits to be brought by the Attorney-General for every case of a charge by complainant in excess of the rates fixed by them, and that there are numerous cases of such excess, and com-

plaintant will continue to so charge until it be judicially determined that it has not the right to do so; that defendants have not the power to determine the justice or reasonableness of complainant's charges, because that involves a judicial function which they are inhibited from exercising by the Constitution of the State; that if not judicial, it is legislative, and cannot be exercised by defendants; that if defendants have any power whatever in the premises it is restricted to fixing rates that are in fact just and reasonable, and they cannot require complainant to reduce its rates to charges which are not reasonable and just to it; and that the rates prescribed by defendants are much less than those heretofore charged by complainant for the same services, and are neither just and reasonable; for though its charges have been much greater than is allowed by the rates fixed by defendants, and have brought a much larger gross income than would be realized from said rates, yet complainant has not only failed to realize any interest upon its investment, but has failed to realize enough to meet the necessary expenses connected with the operation and ownership of its road.

The bill then proceeds to give figures and statements as to the cost of construction and equipment of the road, and its actual value and as to earnings and expenses of its operation, going to show excess of expenses over earnings, and actual loss from the operation of the road during the more than the five years of such operation to date; and alleges facts in regard to the condition and business of the country through which the road runs to show that such loss, even on the basis of its charges, will probably continue for some years. It further alleges that the rates prescribed by defendants are also unreasonable and unjust when compared with those permitted by them to other roads in the State,

giving figures to show the difference ; and that a reduction
of its charges to the rates prescribed by defendants would
compel complainant to forego any possibility of earning any
interest on its investment or any income from the operation
of its road, and that to continue the operation at an actual
loss would render its road valueless ; and that defendants
cannot under the law so act as to produce this result, for
thereby complainant would be deprived of its property
without due process of law contrary to provision of section
1, Article XIV, of the Constitution of the United States.
The prayer of the bill was for the relief which was granted
by the injunction.

On the argument of the demurrer to the bill the Com-
missioners filed an affidavit, intended mainly to show
that in their dealings with complainant they were not led to
expect such complaints as the bill makes, and they say that if
application had been made to them for a change or increase
in the rates and it had appeared to them reasonable and
just, they doubtless would have made proper changes, as
they did in cases of application by other roads.

The preliminary question raised by the demurrer arises
on two of its grounds, the 3d and 4th, viz : 3d, that the
court has no jurisdiction of the mat'ers set forth in com-
plainant's bill, or to grant relief in the premises, and 4th,
that this is in effect a suit against the State.

We will consider first whether this is in effect a suit
against the State. If it is, it is well understood that it can
not be sustained, unless by consent of the State. The ob-
jection springs from the rule that a suit against officers of
of the State, founded on any claim or complaint, the adju-
dication of which against the officers would be in effect an
adjudication against the State, is a suit against the State.
In Osborne vs. Bank of the United States, 9 Wheaton, 738,

and Davis vs. Gray, 16 Wall., 203, the court announced that it would look only to the record to determine whether the State was a party. But in subsequent cases this test is treated as too narrow, and cases against officers were held to be cases against the State, although not named on the record. See Louisiana vs. Jumel, 107 U. S., 711; Cunningham vs. Macon & Brunswick R. R. Co., 109 U. S., 446; Hagood vs. Southern, 117 U. S., 52, and *in re* Ayers, 123 U. S., 443. In the Virginia Coupon cases, 114 U. S., the State being interested, but the court holding she was not a necessary party, it was nevertheless said in its opinion, " that the question whether a suit is within the 11th amendment is not always determined by reference to the nominal parties on the record." And conversely, in the cases of New Hampshire and New York vs. Louisiana, 108 U. S., 76, the court refused to sustain a suit of one State against another, although the Constitution of the United States authorizes such a suit, because it appeared that while on the record the States suing were the nominal parties, yet they were acting for some of their citizens, who were the real parties in interest, and who could not themselves sue the State, being within the prohibition of the eleventh amendment.

It cannot be said, therefore, that the case under consideration is not a case against the State simply because the record does not bear her name, and, indeed, there has been no contention to that effect. So, the question is whether the case comes within any class in which a suit against officers is of such a character that a judgment or decree cannot be given in it without affecting some right or interest of the State, so that the effective operation of the judgment or decree is really against the State rather than the officers sued. In other words, would a decree against these

Commissioners be a decree against the State as the actual party?

The only cases in the Supreme Court of the United States in which it has been held that a suit against officers or others is a suit against the State are Louisiana vs. Jumel; Cunningham vs. Macon & Brunswick R. R. Co.; Hagood vs. Southern, and *in re* Ayers, all cited above. We need only analyze these so far as to show the nature of the question involved in each. The first, Louisiana vs. Jumel, was an attempt of bond creditors of the State to protect and enforce their rights under the law of 1874, which provided for the issue of the bonds they held, and under an amendment to the Constitution of the same year, which ratified the law, as against an ordinance of the new Constitution of 1879, which stopped the further levy of the tax that this law authorized for the purpose of raising revenue to pay interest on the bonds, and also prevented the disbursing officers from using funds in the treasury derived from previous levies for paying such interest. The suits were against officers of the State. It was not denied that this ordinance was unconstitutional; because imparing the obligation of a contract of the State; but the court held that the suits could not be sustained for the reason that the execution of her contract could not be enforced by a suit against her officers, to which she was not a party. The case of Cunningham vs. Macon & Brunswick R. R. Co. was for the foreclosure of a mortgage to secure bonds issued by the company. Prior to its institution the State of Georgia had gone into possession of the road and was still in possession under purchase at a sale made on account of her lien to secure her endorsement of other bonds of the company. The court held that her interest in the property made her a necessary party, and it refused to entertain ju-

risdiction of the case, as she could not be sued without her consent. The case of Hagood vs. Southern was a suit against officers of the State of South Carolina, on bond scrip issued by the State, which declared on its face that it was receivable "in payment of all taxes and dues to the State," to compel its receipt for taxes. This was held to be a suit that could not be maintained, because the State could not be compelled to perform her contract by a suit against her officers. The case of *in re* Ayers was on a writ of *habeas corpus.* A bill had been filed to enjoin officers of the State of Virginia from prosecuting suits in the name of the State against the tax payers reported to be delinquent, for the recovery of their taxes—the gravamen of the bill being that they refused to receive coupons of the State for taxes, though made receivable by law, and that this was a violation of the contract of the State, but that under a subsequent law suits were threatened against those who tendered the coupons, and would not otherwise pay their taxes. An injunction was granted, which the officers disobeyed and they were put into custody for contempt. The writ of *habeas corpus* was for their relief. The court discharged the parties, holding that though the suits threatened might be a breach of the contract of the State, yet the injunctions should not have been granted, because the actual party upon whom it operated was the State, and not the officers who were sued; and there being no jurisdiction against the State the injunction was void, and did not furnish legal ground for the imprisonment.

The court refused jurisdiction of two of these suits, because they involved State contracts, of the third because it involved property of the State, and of the fourth, because although the foundation of the suit involved a contract of the State, the immediate proceeding was to relieve her of-

ficers from punishment for doing in her name, that which, when done, would be her own act.

Looking to cases we find in the State courts, they are substantially of the same nature. That of State *ex rel,* Hart vs. Burke, Treasurer, et al., 33 La., Ann., 498, was a suit presenting in part the same questions as those in Louisiana vs. Jumel, and was decided adversely to the plaintiff on the ground that if he had contract rights against the State they could not be enforced by a suit against her officers, she not being a party. In Weston vs. Dane, 51 Me., 461 ; Marshal vs. Clerk, 22 Tex., 23, and Houstoun, Tap & Brazonia R. R. Co. vs. Randolph, 24 Tex., 317, similiar decisions were given, the cases being against officers on pecuniary claims against the State ; and similiar decisions in Printup vs. Cherokee R. R. Co., 45 Geo., 365, and Hosmer vs. DeYoung, 1 Tex., 764, being cases in which property claimed by the State was involved.

It appears, so far as we can find in the reported cases, that the rule which forbids a suit against officers because in effect a suit against the State applies only where the interest of the State is through some contract, or some property right of hers, or where her interest is in a suit brought or threatened by her officers, in her own name, to enforce some alleged claim of hers. And it is important to observe the character of the interest. It is not enough that the State should have a mere interest in the vindication of her laws, or in their enforcement as affecting the public at large or as they affect the rights of individuals or corporations, but it must be an interest of value to herself as a distinct entity—of value in a material sense. She has an interest in the success of the policy of her laws, and in the just administration and execution of those laws, yet it is not an interest on which she can be said to be a party affected by

JUNE TERM, 1888. 465

Railroad Commissioners v. P. & A. R. R. Co.—Opinion of Court.

any private suit arising under them, when it is not an otherwise and more direct interest inhering in some separate right or claim of right of her own.

With this distinction in mind, how stands the present case? The 5th section of the act constituting the office of the Commissioners provides that they shall "make and fix reasonable and just rates of freights and passenger tariffs to be observed by all railroad companies doing business in this State, on the railroads thereof; shall make reasonable and just rules and regulations to be observed by all railroad companies doing business in this State, as to charges at any and all points for the necessary handling and delivering of freights; shall make such just and reasonable rules and regulations as may be necessary for preventing unjust discriminations in the transportation of freight and passengers on the railroads in this State; shall make reasonable and just rates of charges for use of railroad cars carrying any and all kinds of freight and passengers on said railroads, no matter by whom owned or carried, and shall make just and reasonable rules and regulations to be observed by said railroad companies on said railroads, to prevent giving of any rebate or bonus, directly or indirectly, and from misleading or deceiving the public in any manner, as to the real rates charged for freight and passengers."

The 6th section authorizes and requires the Commissioners to "make for each of the railroad corporations doing business in this State, as soon as practicable, a schedule of just and reasonable rates of charges for the transportation of passengers and freights and cars, on each of said railroads and said schedules shall, in (any suit) brought against any such railroad corporations wherein is involved the charges of any such railroad corporations for the transportation of any passengers, or freight, or cars, or unjust discrimination.

in relation thereto, be deemed and taken in all courts of this State as sufficient evidence that the rates fixed therein are just and reasonable rates of charges for the transportation of passengers and freights and cars upon the railroads, and said Commissioners shall from time to time and as often as circumstances may require, change and revised said schedules." There are other provisions in these sections which it is needless to recite.

The principal complaint of the bill against the Commissioners is that in performing the duty imposed on them they exceeded the authority given by the act, and fixed rates for the road of the complainant that were not reasonable and just, that if said rates are enforced, the road will be operated at a loss, to such extent as will render the property valueless ; and that this amounts to a violation of the State Constitution which forbids the taking of private property without just compensation, and also of the Constitution of the United States, in that it deprives complainant of its property without due process of law. There is here nothing that affects the State in any valuable interest of her own, or affects her otherwise than as she is concerned in having a law of a public nature carried out. Clearly, then, according to the test we think the law applies, the State bears no such relation to this subject matter of the suit as renders her in effect a party to it, and if the injunction sought had been limited to staying the action of the Commissioners in regard to rates only, the objection that she is a party would not obtain.

But the bill goes further, and founds a complaint against the Commissioners in connection with section 17, of the act, which provides a penalty against any railroad company for violating the rules and regulations prescribed by them, and directs that they shall institute action through the At-

. JUNE TERM, 1888. 467

Railroad Commissioners v. P. & A. R. R. Co.—Opinion of Court.

torney-General to recover the penalty. Admitting violation of the rate regulations prescribed for it, the company, resting on alleged want of authority in the Commissioners to fix for it the rates they did, prays that they be enjoined from instituting the action authorized. A further direction of the act is, that the suit, "shall be in the name of the State of Florida." It needs no argument to show that in such a suit the State is a party, and that the injunction asked against the Commissioners to stay the suit would be an injunction in fact against her. It is precisely the case which led to *in re* Ayers, where officers were enjoined from bringing suits in the name of the State, which was held to be void because in fact an injunction against the State, the court saying, if "officers, attorneys and agents are personally subjected to the process of the court, so as to forbid their acting in its behalf, how can it be said that the State itself is not subjected to the jurisdiction of the court as an actual and real defendant?"

There is a class of cases against officers in which suits are held to be allowable, although the officers were acting under orders or authority of the government. This is where they exceed their authority, and in their action commit a tort. "In these cases (the officer) is not sued as or because he is the officer of the government, but as an individual." Cunningham vs. Macon & Brunswick R. R. Co., *supra*.

There is another large class of cases in which suits against officers of the State have been sustained, though it was to enforce obligations of the State, or to compel performance of some act authorized by law of the State in behalf of any one who may have had a substantial interest in its performance as an act on the part of the State. Thus, where a statute makes an appropriation of money out of

the treasury of the State for a certain defined purpose, and directs its payment by the proper officer, leaving in him no discretion to be exercised in regard to its payment, the party entitled may, on refusal of the officer to pay him, have a writ of mandamus against him to compel the payment, and the State need not be a party. High on Ex. Rem., Secs. 101, 104. So, as to the performance by an executive officer of any ministerial act for the State not requiring the exercise of discretion. Ibid., Secs. 107, 110, 127.

This is sometimes treated in the discussion of cases as if connected with the non-liability of a State to be sued, and as an exception to the rule which forbids a suit against her through her officers; but we think this is not strictly correct, and that in this country at least, in regard to executive officers, an entirely different question is involved, to-wit: The authority of one department of the government as constituted here to interfere with the functions appertaining to another. And we treat the case before us in this view, so far as it depends on the point raised by counsel growing out of this doctrine.

The point referred to is, that while in the class of cases just mentioned a suit against an officer refusing to act will be sustained, on the ground that the law speaks to him as a ministerial officer, without discretion as to the thing directed to be done, on the other hand if the law invests him with discretion in doing it, the courts will refuse to interfere with that discretion. Towle vs. State, 3 Fla., 202; High on Ex. Rem., Secs. 42, 8). This is not contested by the opposing counsel, but he meets it on the ground that "the whole gist of the railroad company's case is that the Commission have no discretion which authorizes it to fix rates in the manner fixed in this case; (and) admits that if the act of the Legislature gives it such scope, its discre-

## JUNE TERM, 1888. 469

Railroad Commissioners v. P. & A. R. R. Co.—Opinion of Court.

tion is absolute between the nether limits of a living inter-est upon the investment and the upper limit of attainable profit, but it cannot go below the nether limit, for then it trenches upon constitutional rights. When there is no power, there can be no discretion, and the Commission reaches the limit of its power when in its downward course of reduction it reaches the point where a further descent would deprive the railroad company of a just compensation for its property."

There is no denial, and could be none, as will be evident from a slight consideration of sections 5 and 6 of the act quoted above, that it gives discretion to the Commission-ers in the fixing of reasonable and just rates, and hence this qualified denial is but saying that the Commission ex-ercised its discretion to a wrongful extent. It may be granted that if by enforcing the rates complained of the company would have its property taken without just compensation, or would be deprived of its property without due process of law, the first would be a violation of the Constitution of the State, the second a violation of the Constitution of the United States, and that neither the Legislature nor the Commission under her law, could do either. But we are not at this point called upon to say whether such would be the effect of those rates, or whether the court has authority to adjudicate upon the reasonableness of the rates, or whether the judgment of the Commission as to reasonableness is to be taken as conclusive. These are questions excluded from our consideration, by the fact that the law refuses authority to enjoin the discretionary action of executive officers. It does not matter that the exercise of the discretion works an injustice or wrong. In many of the reported cases, that of Towle vs. State, for one, the inhibition was held to apply, though the officer was legally wrong in the conclusion reached as to the

.rights of the party whose case was brought within his discretion. And we do not see that it makes any difference whether those rights are founded on mere legal protection, or on constitutional protection. The simple test is whether the decision of the officer is one his discretion authorizes him to make, and if it is, the court is powerless to control him. Where this discretion exists mandamus does not lie to direct the manner of its use, nor will injunction step in to control or intercept its use.

It is proper to say, however, that this restraint upon proceedings by the court does not intend a denial of the legal or constitutional rights of any person, but only that the party aggrieved must seek his redress in some other way than by a suit against the officer in fault. In the present case, for instance, if the Commissioners have exercised their discretion in a manner to invade the legal or constitutional rights of the complainant, that will be available for defence in any action against said complainant founded on the violation of the regulations of the Commissioners. This is clearly recognized in the case of *in re* Ayers, where the court, though holding the injunction against State officers restraing them from bringing suits in the name of the State to be void, intimated that rights which could not be thus enforced could be protected in defence of suits against the injured party. See opinion, pp. 494-5.

If the act creating the Commission was unconstitutional and void, it may be that the Commissioners, not in such case being officers, but only individuals really unclothed with office, would be subject to suit, as a void act could not confer any discretion on them ; but its constitutionality is not contested, except against the extent of power claimed for the Commission—" the power of the Legislature to create a Commission with power to make schedules which shall be *prima facie* evidence of reasonableness of rates fixed

by it," not being doubted by the company's counsel, save that "it cannot make them conclusive." In regard to this, it is said that a conclusive determination of the reasonableness of rates by the Commission would be the exercise of judicial power, which is prohibited by the Constitution of the State. But if this be so, it does not affect the question of the liability of those officers to the present suit. It does not remove the protection which they have by virtue of the discretion given to them to fix reasonable and just rates, a wrong exercise of that discretion, as we have said before, not varying the rule which relieves them from suit.

It is said further that if the power claimed is not a judicial one, then it is one that involves legislative power, and for that reason is prohibited by the Constitution of the State. If this has reference to the conclusiveness of rates, as the connection would seem to indicate, what we have just said respecting the exercise of judicial power applies equally here. But if it is meant that the power to fix rates is so far legislative that it cannot be delegated to a Commission, that presents a more vital question, and without considering whether it may be similarly disposed of, we go to its independent merits.

It may be remarked in limine that the power of the Legislature to regulate and fix the charging rates of railroad companies chartered by the State, where the charter itself in a contractual view does not surrender the right to exercise the power, is not disputed ; but that it is a power the Legislature may forego exercising, and when it does that it leaves its exercise to some other agency authorized by its law to act, to wit, this corporation. In many instances this is done as to all rates, and for the company before us it is done, except as to the maximum passenger rate. The regulating and fixing of rates, therefore, is not an inalienable

exclusive function of the Legislature.   And if it may leave
that to the corporation, why may it not delegate it to a
different body ?   The public interest involved is the same,
whether reached by the corporation, or by a supervisory
Commission.

We are not without authority on the question.   Our act
is taken almost entirely from an act of the State of Geor-
gia.   In the case of the Georgia Railroad *et al.* vs. Smith
*et al.*, 70 Ga., 694, the constitutionality of the latter act was
attacked, and on this subject of the delegation of authority
to the Commission was held not to be unconstitutional.
The Georgia Constitution, like ours, gave authority to the
Legislature to regulate rates.   By the former the Constitu-
tion " conferred upon the Legislature the power * of regu-
lating railroad freights and passenger tariffs, preventing un-
just discrimination, and requiring reasonable and just rates
of freight and passenger tariffs."   By ours, " The Legisla-
ture is invested with full power to pass laws for the correc-
tion of abuses and to prevent unjust discrimination and ex-
cessive charges by persons and corporations engaged as com-
mon carriers in transporting persons and property, or per-
forming other services of a public nature ; and shall pro-
vide for enforcing such laws by adequate penalties and for-
feitures."

There is no material difference.   The court says, in its
opinion in the case cited above, that " it certainly was not
contemplated that the details of rates to be fixed over the
many miles of railway in the State, should be settled and
determined by the Legislature.   The many influences that
combine to cause changes in the ever varying vicissitudes
of trade and travel were neither overlooked nor forgotten by
that body.   The utter impossibility of preparing by the
Legislature just and proper schedules for the various rail-

roads with their differences of length, locality and business, appears to us to be so clear and manifest as that to have entertained it would have been absolutely absurd. And especially so, when it is remembered that schedules just and right, where arranged for the months of winter, might be ruinously unjust and wrong for the months of summer; or that such as were proper for the year of the meeting of the General Assembly might the succeeding year well nigh bankrupt every railroad corporation in the State."

In Tilley vs. Savannah, F. & W. Ry. Co., *et al.*, 4 Woods, 427, the same question as to the constitutionality of the Georgia act was passed upon, the court discussing more fully the subject of delegation of authority to the Commission to fix rates, and reaching the same conclusion. The reasons given are on the line of those in the Georgia case. Thus: "The fixing of just and reasonable maximum rates for all the railroads in the State is clearly a duty which cannot be performed by the Legislature, unless it remain in perpetual session and devote a large portion of its time to its performance. The question, what are just and reasonable rates, is one which presents different phases from month to month, upon every road in the State, and in reference to all the innumerable articles and products that are the subject of transportation. This question can only be satisfactorily solved by a board which is in perpetual session, and whose time is largely given to the consideration of the subject.

"It is obvious that to require the duty of prescribing rates for the railroads of the State to be performed by the General Assembly, consisting of a Senate, with forty-four members, and a House of Representatives, with one hundred and seventy-five, and which meets in regular session only once in two years, and then only for a period of forty days, would result in the most ill-advised and haphazard

schedules, and be productive of the greatest inconvenience and injustice, in some cases to the railroad companies, and in others to the people of the State. It is impracticable for such a body to prescribe just and reasonable rates. To insist that this duty must be performed by the General Assembly itself is to defeat the purpose of that clause of the Constitution under consideration."

Under a Mississippi statute, creating a Commission with supervisory powers over railroad rates, it was held to be constitutional by the Supreme Court of the State, and also by the Supreme Court of the United States, although there was vested in the Commission authority to regulate and change rates. Stone *et al.* vs. Y. & M. V. R. R. Co., 62 Miss., 607 ; Stone *et al.*, vs. Farmers' L. & T. Co., 116 U. S., 307. The question of delegation of legislative power was not directly discussed in these cases, but was necessarily involved, and the authority given to the Commission by the act to regulate rates could not have been sustained except upon the conclusion that such authority was constitutionally given.

Other cases announcing the same conclusion, are State *ex rel.*, Railroad & W. Commission vs. Chicago M. & St. P. Ry. Co., 37 N. W. Reptr., 782, and Chicago & N. W. Ry. Co. vs. Dey *et al.*, published in " The Railway Age," August 3, 1888. We find no decision, and think there is no good reason to the contrary.

There are cases upon similiar statutes of other States, where this question has been passed *sub silentio*, but this being only indirect support of our conclusion, these need not be cited. We hold that the Legislature in the act under consideration did not delegate to the Commission any power so far its own exclusively that could not be delegated.

Under the views on which we decide this case, it is un-

necessary to determine the other questions appearing in the record. The bill should be dismissed, and it is so ordered.